AND THE

## CORRECTION OF ERRORS

OF THE

## STATE OF NEW-YORK,

IN APRIL, 1811, AND IN 1812.

---

JOHN V. N. YATES,     *Plaintiff in error,*

              *against*

JOHN LANSING, JUN.     *Defendant in error.*

THIS cause came before the court, on a writ of error from the supreme court. The plaintiff brought an action of debt, in of the court of chancery, for malpractice and contempt, and a judge of the supreme court, in vacation, on a *habeas corpus,* discharged the prisoner, and the chancellor, afterwards, recommitted him for the same cause; it was held that the chancellor was not liable to an action, at the suit of the officer, for the *penalty* given by the *fifth* section of the *habeas corpus* act. (Sess. 24. c. 65.)

A judge of a court of record is not liable to answer personally, in a civil suit, for any act done by him in his judicial capacity, nor for errors of judgment.

Where a master in chancery was committed, by order of the court of chancery, and the order stated that A. B. while he was master, filed a bill to which he subscribed the name of C. D. one of the solicitors of the court without his knowledge or consent, &c. " contrary to the statute in such case made and provided, in wilful violation of his duty as master, and in contempt of the court, and the said A. B. was ordered to be committed to gaol until the further order of the court ;" it was held to be a legal commitment for a *contempt;* the words " contrary to the statute," &c. being surplusage; and that a judge of the supreme court could not, on *habeas corpus,* discharge the person so committed from his imprisonment.

The court of chancery may, in its discretion, commit for a contempt, on the affidavit of witnesses only, without first putting the party to answer on interrogatories.

A commitment for a contempt for an indefinite time, or " until the further order of the court," is good.

Whether a judge of the supreme court, in vacation, has any power, under the *habeas corpus act,* other than to bail persons committed for trial, or to keep the peace and answer indictments? *dubitatur.* He has no power to discharge a person, committed by order of the court of chancery, on a conviction for a contempt of that court.

And where a judge in vacation, on *habeas corpus,* discharged a person committed by the chancellor on a conviction for a contempt, and he was again recommitted for the same cause, such recommitment was held legal.

A person who has been regularly committed by the chancellor for a contempt, and afterwards is improperly set at large, may be recommitted by an order of the court of chancery, reciting the original writ or attachment.

*It seems,* that the supreme court cannot discharge, on *habeas corpus,* a person committed by the court of chancery, for a contempt of that court.

*Marginal note:* Where the chancellor committedone of the officers

VOL. IX.                 3 E

the court below, to recover the penalty of 1,250 dollars, under the 5th section of the habeas corpus act. The defendant pleaded specially, and there was a demurrer to the plea, on which the court below gave judgment for the defendant. See 5 Johns. Rep. p. 282—299.

The counsel declined arguing the demurrer in the court below. The following is a brief statement of the arguments in the court of errors :

Rodman and Van Buren, for the plaintiff in error. The defendant having been discharged, by Mr. Justice Spencer, under the habeas corpus act, was again recommitted for the same offence, by the defendant, knowing of such discharge. These facts, admitted by the pleadings, prima facie, are sufficient to entitle the plaintiff to recover. It is, then, incumbent on the defendant, in order to exonerate himself from the penalty, either to bring his case within some of the exceptions of the statute, or to make out a defence arising aliunde. The act declares, that the person set at large by habeas corpus, shall not be again imprisoned for the same offence, " unless, 1. By the legal order or process of the court, wherein he is bound by recognisance. to appear ; or, 2. By other court having jurisdiction of the cause." The defendant does not pretend to avail himself of the first exception ; and, as to the second, this court, in the case of The People v. Yates,(a) at the last session, decided, that by the words " other court having jurisdiction of the cause," was meant the court in which the defendant was bound, by recognisance, to appear, or some court having general criminal jurisdiction ; as the courts of oyer and terminer and general sessions of the peace.

The next ground of defence is, that admitting the defendant was mistaken, he acted judicially, as a court of chancery. This presents the most material question for discussion in this cause ; for the other points have been already settled by this court, in the case of The People v. Yates. The unlimited irresponsibility of the court of chancery cannot be maintained by any authority ; and we presume will not be asserted in this case.

It would be a most dangerous principle ; and would subvert the whole system of our jurisprudence. The power of a judge must be limited. And the principle we shall contend for is this ;

(a) 6 Johns. Rep. 337. 512.

that a judge is not responsible, so long as he acts within his jurisdiction. In the cases cited by the *Chief Justice*, in delivering the opinion of the court below, from the *Year Books*, and *Staunford, &c.* the justices clearly acted within their jurisdiction.

IN ERROR.
......
ALBANY,
April, 1811.

So in *Hammond* v. *Howell*,* and the other cases, the court acted within their jurisdiction; but committed an error of judgment, for which they were not considered as responsible. The case of *Floyd and Barker* (12 Co. 23.) was in the court of star-chamber, which was, afterwards, abolished for its arbitrary assumption of jurisdiction. In *Miller* v. *Searl and others*,† the point decided by the court was, that the commissioners of bankrupts had exceeded their authority, and were, therefore, liable to an action for false imprisonment. The position of Lord Chief Justice *De Grey*, that the protection afforded to superior courts is absolute and universal, is a *dictum* only, and the cases he cites in support of it, were those in which the judges had jurisdiction. A man who judges of a matter, on which he has no authority to decide, is not to be considered as a judge, but as a private individual. Indeed, the supreme court, in this case, and the *chancellor* himself, in the *printed case*, which has been produced to this court, put it on the ground, that the subject was within the jurisdiction of his court, and that he had a right to decide on contempts. In *Creps* v. *Durden*,‡ Lord *Mansfield* considered it to be an agreed point, that where a justice exceeded his jurisdiction, he was liable to an action. The same distinction is laid down by Lord *Coke*, in the case of the *Marshalsea* ;§ that when a court has jurisdiction of a cause, and proceeds, *inverso ordine*, or erroneously, there the party who sues, or the officer who executes the process, is not liable ; but when the court has no jurisdiction of the cause, the whole proceeding is *coram non judice*, and an action will lie. As if the court of common pleas, in *England*, should undertake to decide criminal cases, or pleas of the crown, the proceedings would be *coram non judice*, and the judges liable as individuals. Had, then, the defendant jurisdiction in this case ? This question has been settled in the negative by this court, in the case of *The People* v. *Yates*.** That decision must be final and conclusive. It is now the fixed and unalterable law of the land.

YATES
v.
LANSING.
* 2 Mod. 218.

† 2 W. Bl.
1141—1145.

‡ Cowp. 640.
645.

§ 10 Co. 70—
76.

** 6 Johns.
Rep. 498, 499.
502—504, 510.
512.

Admitting that the remedy by an action at common law is doubtful; there can be no doubt since the statute has given the

IN ERROR.
••••••
ALBANY,
April, 1811.

YATES
v.
LANSING.

penalty to the party aggrieved. It is given against any person who shall commit, or cause to be committed, &c. It is not merely the ministerial officer who arrests, and commits, but the court ordering the commitment, is also made liable. The persons liable are not particularly named; but that was unnecessary, as the words are as general and comprehensive as could be used. And this construction is confirmed by the concluding words: "Any colourable pretence or variation in the warrant of commitment notwithstanding." Indeed, if such is not the true construction of the act, then this boasted palladium of the rights of the citizen is a dead letter. It may be said that the judge may be impeached; but impeachment brings no recompense to the injured individual.

Henry and Van Vechten, contra. It has been very justly observed that this cause is very important as regards the jurisprudence of the state. It involves the question as to the powers of courts to commit for contempts, and as to the jurisdiction of the court of chancery. It is to be regretted that the counsel for the plaintiff should consider these points as already adjudged by this court. We deem it our duty, however, with great respect, to examine them. It is not denied that the decisions of this court are immutable, as it regards inferior courts. But unless this court assumes to itself the attributes of perfection and infallibility, it will not consider itself bound by its own opinions, if, on further examination, they should be thought erroneous.

The greatest and most illustrious judges in England have changed their opinions, and thereby changed the law. But we claim a right to examine these points; for a party is entitled to be heard before he is judged, and the defendant has not been heard on them.

A court of justice has a right to commit for a contempt, not only of its power, but against its purity. It has been said that a violence, or contempt, in the face of the court, may be punished; because the crime is merged in the atrocity of the contempt;[*] but not acts done out of court, in contempt of the court. Contempts are either direct, or consequential.[†] Any corrupt practices in the subordinate officers of a court are contempts. Attorneys, solicitors, sheriffs, bailiffs, parties, witnesses, jurors, &c. are all subject to the animadversion of courts, for contempts.[‡] There are various classes of constructive contempts, founded on the criminal conduct of the officers of courts, and involving also a criminality

* 4 Johns. Rep. 328.

† 4 Bl. Com. 284—288.

‡ Bac. Abr. Attachment, (A). 1 Com. Dig. 193. Attachment, (A).

for which they are indictable. The power of a court to punish
the offender in such cases is essential to the due administration
of justice. The various contempts are stated by *Hawkins.\**
And contempts which do not strike directly at the power of the
court, and which are indictable offences, may be proceeded against
summarily by attachment; as in case of *extortion* of an officer,
forging a writ, &c. Signing a counsellor's name to a bill in
equity, without his consent, has been punished as a contempt.†
*Deceit* is an *offence* punishable by statute, by fine and imprison-
ment;‡ yet an attorney who is guilty of *deceit*, may be proceeded
against by attachment for a contempt of court.

This law as to the powers of courts to punish for contempts, is
the settled law of *England*,§ grounded upon immemorial usage, and
recognised and confirmed by *magna charta*. By the 35th article
of our constitution, it is also the common law of this state; for no
statute has ever been passed to abrogate this law. Indeed, it
seems to be admitted that courts have this power, and it is not de-
nied that the court of chancery possesses it equally with the courts
of common law.

If the conduct of the plaintiff amounted to a contempt, it was
the duty of the chancellor to punish it, and protect the suitors in
that court from the oppression of its officers. That the act of
which the plaintiff was guilty was in violation of a statute,
was an aggravation of the offence, but the suitor was not to be
told to seek his remedy by indictment. Admitting it to have
been an offence against the statute, the *contempt* was not *merged*
in the crime. If that were the case, then *extortion*, *bribery*, and
*libels* on courts, could not be punished as contempts. Will the
power of either branch of the legislature to commit for a contempt
be questioned? Whence is that power derived? Not from the
constitution, but from the common law, the source from whence
courts of justice derive their power.

The chancellor did not punish the plaintiff for a crime, but
merely for a *contempt*. He describes the offence, it is true, as a
crime, to show its aggravated nature; but though the offence may
be double, there has been but one punishment by the chancellor,
that for a *contempt*. How, then, has he assumed a criminal jurisdic-
tion? A court is not to be presumed to act beyond its jurisdiction.
That must be clearly and satisfactorily shown. But there is no evi-
dence of it in this case; or that the plaintiff has been injured by
the commitment for a contempt. Suppose a person should cut

\* *Hawk. At-tachment*, b. 2. c. 22. s. 2, 3, 4, 5, 6. 9, 10, 11.
† *Thistleth-waite's Case*, 1 Com. Dig. 594.
‡ *Laws*, v. 1. p. 221.
§ 4 *Bl. Com.* 286.

ALBANY,
April, 1811.

IN ERROR.
......
YATES
v.
LANSING.

*Laws,* vol. 1. p. 221. sess. 24. c. 32. s. 9.

† 3 *Bl. Com.* 137, 138. *Mod.* 429.

‡ Sess. 24. c. 65. s. 3.

off the ear of a suitor in court; and the court, in its order of commitment for the contempt, should add that it was also against the statute; would this description be an assumption of criminal jurisdiction? The order of commitment, in this case, if fairly read, does not assume any such jurisdiction. Strictly speaking, the conduct of the plaintiff was not an offence against the statute; for, though a master is prohibited from acting as a solicitor,* yet he cannot be said to act as a solicitor, when the proceedings are carried on in the name of another person who is a solicitor. If he was, in fact, a solicitor of the court, while he held the office of master, his right to act as solicitor was suspended. But though not an offence within the words, it is within the spirit of the act; and such an attempt to evade its provisions, was an aggravation of the contempt.

If, then, according to the fair construction of the order of commitment, the plaintiff was imprisoned for a contempt; the judge had no authority, under the *habeas corpus* act, to discharge him.

Our *habeas corpus* act is a copy of the *English* statute, and though, in the last revision of the laws, the *preamble* has been omitted, yet it is, notwithstanding some slight verbal alteration, to receive the same construction. A judge, at *common law*, has no power to allow a *habeas corpus.* The writ issued in this case was marked " by the statute;" we must, therefore, look to the statute for the power of the judge. The *habeas corpus* act " extends only to the case of commitments for such criminal charges as can produce no inconvenience to public justice by a temporary enlargement of the prisoner; all other cases of unjust imprisonment being left to the *habeas corpus* at common law."† Its object is to relieve persons from imprisonment in *bailable* cases. The act‡ says, that " any person," " other than persons convict, or in execution by legal process, or committed for treason or felony, plainly and specially expressed in the warrant of commitment," may apply, &c. No other person can apply to a judge in vacation for a writ of *habeas corpus.* And if he cannot apply, the writ cannot be allowed.

Again, as to the manner in which this power is to be exercised. The judge is to discharge the prisoner, on taking his recognisance to appear at the next court at which the offence is properly recognisable. This clearly shows that the judge is authorized to discharge only, where the prisoner is to be *tried* for a *bailable* offence. The object of the act is to relieve the person from prison

until he is *tried.* Again, the judge is to take sureties according to the *quality* of the prisoner, and the nature of the *offence.* It follows that a judge has not power to discharge, except for a bailable offence. Can he discharge where the prisoner, on the face of the commitment, is in prison, for an offence not bailable or to be tried? He cannot, by the express exception of the statute, where the person is convicted, or in execution: nor can he discharge in a case of treason or felony. But the supreme court may discharge in such cases. The power of the judge in vacation is not, therefore, coördinate with that of the supreme court, but is limited and subordinate. He cannot enforce obedience to the writ, or compel its return. The judge, in the present case, admitted the fact that this was a commitment for a *contempt;* for, in assigning the reasons for the discharge, he declared the commitment illegal. He does not say that the party was not convict, or not in prison, on conviction for a contempt. We contend that he had no power to pronounce the commitment illegal. The court of *king's bench,* in *England,* would not bail in such a case.* 

*\* Hawk. b. 2, c. 16.*

Suppose a person in prison on execution for a debt brought before a judge in vacation, will it be said that he can discharge him on *habeas corpus?* But if he cannot in such a case, nor in treason or felony, whence does he derive his authority to discharge a person committed for a contempt? It has been said that our statute gives the judge cognisance of the case of every person imprisoned, whereas the *English* statute confines it only to persons imprisoned for *crimes.* But there is no ground for the distinction. The whole language of our act shows it was intended to be precisely the same as the *English* statute from which it was copied.

The form of the warrant in this case was no ground for the discharge. It was according to established usage. It is not necessary that it should be definite or limited as to time. " Until discharged by due course of law," are words equally indefinite, and yet they have always been held sufficient.† Suppose a bill of discovery, and the defendant refuses to answer, and the chancellor commits him for a contempt, must the commitment express a limited time. If so, the complainant may lose his right, by the contumacy of the defendant. It is said, it should be " until a compliance." But who is to judge of the compliance? The chancellor. Then, where is the difference?

*† Hawk. b. 2, c. 16. s. 18.*

Again, it is said the conviction was illegal because no interrogatories were administered. But interrogatories are not indispen-

IN ERROR.
······
ALBANY,
April, 1811.

YATES
v.
LANSING.

* 4 Bl. Com.
288.　Doug.
576.

† 2 H. P. C.
122.

‡ 4 Bl. Com.
284, 285.

sably necessary. An examination on interrogatories is matter of grace, not of right.* And Mr. *Yates* waived all objection to the proceeding against him; for, after notice, he refused to appear. It is a conviction, on default, after notice, which is the same as a confession of the truth of the charge.

Again, it is said there could not be a commitment by an order; but it should be by a writ or warrant under seal. Every court may prescribe the forms of its own process; and an *order* may be as proper and as efficacious as a writ.† Being a commitment by a court of record, an order was sufficient.

The discharge by Mr. Justice *Spencer* was a nullity; it was no discharge under the act, any more than if granted by the gaoler. The chancellor, then, had a right to recommit. The *fifth* section of the act excepts from the penalty when the recommitment is by *a court* having jurisdiction. The penalty applies to *persons*. It cannot apply to a *court* recommitting a party who has been illegally discharged.

The discharge was from the imprisonment, not from the conviction, which remained of record. And the order of commitment expressed that it was to be until he paid the money which he had illegally exacted.

The chancellor clearly had jurisdiction, and the order was a species of civil execution.‡ If discharged for the informality of the order, or *without any* reason, still the chancellor had a right to recommit, for the nonpayment of the money. It is incongruous to suppose that a judge in vacation can act in case of a conviction for a contempt; for the *habeas corpus* does not bring up the conviction, nor can the judge have it before him, for he has no supervisory power. If a contrary doctrine should be admitted, then a *judge* of the supreme court, in vacation, might discharge a person committed by order of *that court*, for a contempt; nay, a *commissioner* would have the same power.

The judge has no power to discharge a person *convict* from prison; and no penalty can be incurred from recommitting a convict. There was no need of a *trial*. The judgment was already pronounced, and the party in execution. The discharge by the judge could not discharge the *offence*.

If the discharge by the judge was illegal, it was the duty of the chancellor to recommit. There was a judicial exercise of discretion and judgment. The plea states that the defendant acted as a court. Is it just or reasonable that a court should be subject to

this penalty for the honest exercise of its judgment? The statute did not intend to punish an error of judgment as a crime.

Again, the penalty is against a *person*, not a court. Suppose the supreme court should commit a person convicted of an offence, and the *chancellor*, on *habeas corpus*, should discharge him, and that court should recommit the party; who is to be liable to the penalty? Would each of the judges be liable? If one or two dissented from the opinion of the rest of the court, would they also be liable? Is the penalty to be divided among the judges, and how is it to be levied? In the present case, the proceeding of the chancellor has been sanctioned by three of the judges of the supreme court. They affirmed his decision, and remanded the prisoner. If the chancellor is liable to the penalty, those judges are equally liable. But the statute never was intended to apply to such a case, or to punish an error of judgment. The *habeas corpus* act was intended to relieve persons committed for *trial*, and to guard against the abuse of the power of the crown and its ministers in *England*. The penalty was to prevent any delay in the *allowance* of writs of *habeas corpus*, as to which no discretion was to be exercised. The evil which was to be remedied, was the delay in bringing persons committed to prison to trial.*

* *Hawk.* b. 2. c. 14. s. 24.

Again, we say that the judges of the superior courts are not answerable, personally, for their judicial acts. There is a distinction between an excess of jurisdiction, and having no jurisdiction at all. A judge is to be excused in an error of judgment, as to the extent of his jurisdiction. If any fault has been committed, in the present case, it is in committing for a constructive contempt. Is the defendant to be made answerable for this? If he is liable to the penalty in this case, he is equally responsible for every decree of his court which is reversed. Who would dare to take upon himself the office of a judge, if, for a mistake in the honest exercise of his judgment, his peace is to be disturbed by vexatious suits, his property wasted, and his dignity trampled in the dust? Are the judges of the courts of *common pleas*, many of whom are not lawyers, to be answerable for errors of judgment? Certainly not. Judges are responsible only for a wilful and corrupt violation of duty; and that in the mode pointed out by the constitution. They may be impeached and degraded from office.

Again, this is an action for a penalty. Penal statutes are to

IN ERROR.
......
ALBANY,
April, 1811.

YATES
v.
LANSING.

be construed strictly. If there is any doubt, the construction ought to be favourable; and is there not room for doubt, when the majority of the supreme court, men of the highest judicial talents, have, by their decision, sanctioned the decision of the chancellor? Is a statute to be liberally construed to work a forfeiture? Must we resort to a subtle and refined construction, to minute verbal criticism, in order to spell out an offence? Will not this high court, in such a case as this, rather adopt a benign and liberal construction? Again, it is to be observed, that the statute provides, in case of actions brought against a justice of peace, mayor, recorder, alderman, sheriff, &c. for any thing done, by virtue of their office, that in case the plaintiff does not prevail, he shall be liable to *double* costs. Nothing is said in this statute of the judges of the higher courts. This silence shows that the legislature did not suppose the judges of those courts liable to such actions, otherwise, provision would have been made to protect them, also, from vexatious suits. This act also shows that the legislature intended to restrain such actions, even in regard to inferior magistrates.

*T. A. Emmet*, in reply. It is said that Mr. *Yates* is a convict of record. It is true, that it is so stated in the pleadings. The court of chancery, as a court of equity, is not a court of record. The orders are of record, but not that the conviction was well founded. The plaintiff was not examined on interrogatories. The established mode of proceeding, in case of a contempt, is first to grant a rule to show cause why an attachment should not issue; and if no cause is shown, the attachment issues, and the party is brought into court; interrogatories are filed, and on the answers of the party, the master reports whether the party is in contempt. The party is not bound to speak, until called upon by interrogatories. We complain, then, that the plaintiff has been condemned unheard. Again, it is said that the commitment was for the non-payment of the costs. Three things are recited in the order; the dismissal of the bill, the payment of costs, and the commitment for malpractice and contempt. The last had no reference to the first and second. The costs were to be collected in the ordinary way, by an attachment for the nonpayment of them. Remuneration was not the object of the commitment. It was solely for the malpractice and contempt. But we have supposed that this and the other points which could arise, except the question of judicial inviolability, were definitively settled by this court, in the case of *The People v. Yates;* and that the only point for discussion in this

cause was, whether the defendant was liable for the penalty. But this court of *dernier resort* has been called on to do, what no such court ever did, to overturn its former decisions. Inferior courts, it is true, have changed, and may change their decisions. But if the decisions of the court of the *last resort* are not to be permanent and unalterable, then there is no such thing as settled law. The decision in the case of *The People* v. *Yates,* as soon as it was pronounced, was the established law. Is it to be changed because it is recent, and as yet in the gristle? Must it be ossified by time, before it can be fixed? The decisions of this court are and must be the law, until altered by the legislature. In *England,* in consequence of the decisions of their courts, the act of 10 and 11 *Wm.* III. c. 16. was passed to enable *posthumous* children to take in remainder, in the same manner as if they had been born in their fathers' lifetime.＊ It is absurd, then, to cite all the authorities and cases on points which this court has already settled. Why is this court called upon to change its decisions, and to subvert the maxim *stare decisis?* Is every thing to be set afloat, and the character and consequence of the court to be lost? If it can thus change its decisions, the court itself ought to be changed. If its decisions are wrong, let them be set right by the legislature. But, if the court itself can alter its decisions, it is in vain to study the law. I protest, therefore, against going into an examination of the points already decided by this court, though I may be obliged incidentally to notice some of them.

It has been said that the *English habeas corpus* act and that of this state are substantially the same, and are to receive the same construction, and that the former was intended to guard against the power of the crown and its ministers. But as there is no king, nor lords, nor secretaries of state here who can commit, that could not be the object of our statute.

Again, it is said that the act does not extend to convictions, or persons imprisoned on conviction; but if this statute gives no supervisory power, what will be the consequence in regard to the convictions of inferior magistrates? If a person should be seized by lawless force, to be carried out of the country, how is he to be relieved in vacation, unless the statute extends to imprisonments generally? Suppose a person, unjustly and wrongfully confined, by order of a magistrate, upon an allegation of being a lunatic, how is he to be liberated unless by the statute?

But according to the practice of the judges of the supreme court, persons convicted have frequently been discharged on *ha-*

*IN ERROR,*
••••••
ALBANY,
April, 1811.
YATES
v.
LANSING.

＊ 3 *Bl. Com.* 169. and *note* by *Christian.*

*IN ERROR.*
......
ALBANY,
April, 1811.

YATES
v.
LANSING.

beas corpus. *Benedict Lewis,* in *October,* 1807, and *Hannah Clap,* in *October,* 1810, who had been *convicted* under the act relative to disorderly persons, were brought before the *Chief Justice,* on *habeas corpus,* and discharged. Many years ago, *William Kettletas,* who had been committed for a contempt, by order of the assembly, was, after the adjournment of the legislature, brought before Mr. Justice *Benson,* on *habeas corpus,* and discharged by him. Several other similar cases, before other judges of the supreme court, might be mentioned.

Again, it is said that the statute extends only to *bailable offences.* But the power to bail does not depend on the statute. It is a distinct and separate power. At common law, a person may

* *H. P. C.*
126.

be bailed, without being brought before a judge.* This statute would be useless, if confined to imprisonments for bailable offences. Is, then, this great remedial statute to be placed as an idol in the temple, without eyes, without hands, without ears, without intellect or sense; to be worshipped by the ignorant, and laughed at by the cunning?

It is said we must construe the act in reference to the preamble. No. The preamble was struck out because it was false and inapplicable to this country. It was struck out, that the legislature of the state might go beyond the *English* act; that they might soar above that statute, weighed down to earth, as it was, by the doctrine of *impressment.* Our act was intended to extend to every case of imprisonment. In *England,* the *habeas corpus* act is a political engine. I adjure this court to consider the dreadful mischiefs which would result from limiting this act according to the construction which has been given. No respect for any individual, however high in office, and respectable, or however upright his intention, should influence this court to sacrifice a law, so essential to the administration of justice, and the protection of the citizen.

It has been said that a judge has no power to compel a return of the cause of conviction; but all commitments of inferior courts, or magistrates, must set forth the cause, otherwise they are void.

A person legally convict cannot be discharged, but a person convict by illegal process, may be discharged. A comma should be placed after the word convict, and after execution, and then the words "legal process," will properly read as applicable to convict.

Another objection is, that the power of the judge in vacation, and that of the supreme court are different; but except as to cases

IN ERROR.
......
ALBANY,
April, 1811.

YATES
v.
LANSING.

of treason and felony, their powers are precisely the same. It is said that such a power in a judge would be liable to abuse. So is all judicial power liable to abuse; but it must be confided. That it may be abused, is no reason why it should not be given. The law places a just confidence in the judges, that they will act with caution and deliberation, and will not abuse their discretion.

Unless such a power had been given to judges in vacation, of supervising convictions, and relieving persons illegally imprisoned, the greatest oppression would be practised. The party must wait weeks before he can apply for a discharge.

Thus much it seemed necessary to say, in answer to the objections which have been raised.

It remains to examine what we conceive to be the only real point of discussion in this cause, that is, the extent of judicial responsibility.

The *Chief Justice*, in delivering the opinion of the court below,[*] admits that where courts of special and limited jurisdiction exceed their powers, the whole proceedings are *coram non judice*, and all concerned in them are responsible. He asserts the inviolability of the judges in a threefold view; 1. Where a court of special and limited jurisdiction acts within the sphere of that jurisdiction:

[* 5 *Johns. Rep.* 290— 298.]

2. That this protection, or irresponsibility, is *absolute* and universal, as to the judges of the superior courts of general jurisdiction, such as the court of chancery, and supreme court:

3. " That the law," in the language of *Hawkins*, (b. 1. c. 22. s. 6.) " has freed the judges of all courts of record from all prosecutions whatsoever, except in parliament, for every thing done by them openly in such courts, as judges."

The first position, though, perhaps, susceptible of restriction, is admitted to be true at common law.

The third position appears to be an extension of the second position, and to lay down that the absolute and universal protection there spoken of, is afforded, not only to the superior courts of general jurisdiction, but to every *court of record*, from the highest to the lowest, whether of general or limited jurisdiction: And, perhaps, it will be found that those superior courts have no more absolute or universal protection, than any other court of record; and that as good authority is to be found for the one position as the other. But if the exception to the first position, as to the court exceeding its powers, be true, there must be an error in the

IN. ERROR.
......
ALBANY,
April, 1811.

YATES
v.
LANSING.

third position, for many courts of record are courts of inferior and limited jurisdiction; such as the *marshalsea* court in *London;* all corporation courts, and courts leet in *England;* courts of common pleas in the several counties of this state, and the justices' courts in the city of *New-York.*

This position, in its extended sense, is not only contrary to the *exception* in the first *position,* which is admitted to be undoubted law, but is contrary to the decision in the *Marshalsea Case,* and is not supported by any authority whatever; for in every case in which the position is at all laid down, the judge was undoubtedly acting within his jurisdiction; and the only question was, whether any proceedings could be had against him, for corruption, misconduct, or violence in the discharge of duty, while acting within his jurisdiction.

In the case of 27 *Edw.* III. pl. 18. *Lib. Assisarum,* A. as a judge of *oyer and terminer* had jurisdiction both of trespass and felony, and in every entry on the record, however corrupt his conduct was, he certainly was acting within his jurisdiction. The principle of that case is, indeed, perfectly inapplicable to the position laid down. It was, that an indictment would be an averment against the verity of a record.*   In truth, this difficulty of averring against a record is the reason why the expression of judges of record, &c. is so frequently used; as that circumstance frequently created an impossibility of proceeding against them, which did not exist as to judges not of record.

* 12 Co. 24. b. 25. a.

In 9 *Hen.* VI. 60. pl. 9. a writ on the case was brought against *A.*, setting forth, that he said *A.* when he was *escheator, &c.* took an office, or inquest, by twelve jurors, and alleged the office in certainty, and how he had returned another office contrary to this. *Fultham* said, this action does not lie, for this office was taken by virtue of a writ, and so it is in some sort a judgment of record. *Babington* said, such an action could not be maintained against a justice of record; but in that case, it would lie, for an escheator is not a justice of record; but an officer of record. *Martin* compared it to a false return by a sheriff, who is also an officer of record, that is, not a judicial but a ministerial officer, and, therefore, the office, when returned by him, was not a record.

The case in 9 *Edw.* IV. 3. pl. 10. was an action of trespass, assault and battery. The defendant said, that at the time of the alleged trespass, he was a justice of the peace, and the plaintiff made an assault on one *B.*, and to preserve the peace, the defend-

1

ant came and charged him to keep the peace, and he would not, wherefore he peaceably put his hands on him and arrested him to find sureties for his good behaviour, which was the same assault for which the plaintiff brought his action. The plaintiff contended, that as he had not been put in gaol, the purpose was never executed, and, therefore, the first arrest was *tortious. Choke,* said when the defendant arrested the plaintiff it was good, and when he let him go at large, it was for his advantage, but it would be otherwise as to a sheriff, &c. *Littleton* added, justices of the peace can at their discretion arrest a man to find surety, and although he should let him go at large without surety, still the party cannot punish him; for he is a judge of record. In this case the defendant was clearly acting in his jurisdiction.

In 21 *Edw.* IV. 67. pl. 49. *Catesby* came to the bar and moved, that there was no difference in *conspiracy* between a juror who is indicted and a justice of the peace; but both shall be always excused. *Pigot* said, this is not just; for the juror takes the indictment on his oath, and although he has done wrong, in speaking before that time, yet the law intends when he comes to take the oath that he will say the truth; but justices of the peace have no such excuse for speaking and conspiring before the sessions. *Catesby* said, the justices of the peace are sworn to do their duty, as well as the jury is on the indictment; and when a man comes to him before the sessions, and shows that he has been robbed by such a person; and shows the suspiciousness of the act and the circumstance, the justice may demand of him different questions, and on this he is held to inform. *Brian* said, it is good (if you do so) that you be assisted with the other justices of the peace, for one justice cannot take nor hold sessions singly, nor do any thing singly, but take sureties of the peace; and therefore he cannot take this information singly, and for what he does in the sessions, he is excusable, but not for speaking out of it. *Choke* said, it is hard that justices of the peace cannot take informations out of the sessions; and if an indictment was shown to *Catesby* and *Pigot, king's serjeants,* whether it was sufficient, they might communicate of the manner and the matter of the indictment by law. *Pigot* said, a justice of the peace, during the time of the session, may take information of the king; but if he does any thing beyond his office, he is punishable, although he is a judge of record, &c.

IN ERROR.
......
ALBANY,
April, 1811.
⌣⌣⌣
YATES
v.
LANSING.

The doctrine of this case is laid down too broadly by the *Chief Justice;* it was not maintained by all the judges; nor did it extend to a general irresponsibility. It is only, that for what a justice did in the sessions, in his office, he was not amenable *as for a conspiracy.* And many cases of irresponsibility of judges, as for a conspiracy, may be found in the *Year Books,* some of which are referred to in 12 *Co.* 23. And that case, *Floyd and Barker,* does not lay down any rule of general exception, but is confined strictly to not being answerable as for a conspiracy. The language of that decision is not fully stated by the *Chief Justice.* It is there said, that the judges are " not to be drawn into question *for any supposed corruption which extends to the annihilating of a record* of any judicial proceeding before them," &c. " except it be before the king himself," &c. " And the reason why a judge, for any thing done by him as a judge, by the authority which the king hath committed to him, and as sitting in the seat of the king, (concerning his justice,) shall not be drawn in question, *for any surmise of corruption,* except before the king himself, is for this," &c. There is nothing in that case which goes beyond a protection from responsibility for a *conspiracy* or corruption, as to any thing done within his jurisdiction.

*Arie* v. *Sedgwick** was an action on the case for taking a false oath in the court of chancery. *Noy* was merely counsel,(a) and he cited a case in 30 and 31 *Eliz.* in *B. R.* in which it was adjudged that if one gives evidence against a felon, who committed no felony, and when no felony was committed, that an action on the case lies against him; no action on the case lies against a judge for any thing which he does as judge; and he cites several other cases from the *Year Books* to the same effect. His positions relate only to things done in the course of justice.

*Hammond* v. *Howell†* was decided on the same principle. It was contended that although the trial of *Penn* and *Mead,* and the taking of the verdict was within the commission, yet the fining of the jury and the imprisonment of them were not within the commission. But the court repelled this doctrine, and held that " the court at the *Old Bailey* had jurisdiction of the cause, and might try, and had power to punish, a misdemeanor in the jury to acquit the prisoners, which in truth was not so, and therefore it was an error of judgment for which no action will lie." The case of

* 2 Roll. Rep. 197. Vide Cro. Jac. 582. 601.

† 1 Mod. 184. 2 Mod. 218.

(a) The judges were *Mountague,* Ch. J. *Doderidge, Chamberlaine* and *Haughton.* Js.

*Groenvelt* v. *Burnwell** goes on the same principle that the court had jurisdiction, and on the principle laid down in 12 *Co.* that being a judge of record, there could be no averment against the record, as to the mal-administration of physic. This appears from the second and fifth points in the case, and from the last point. The *dicta* in *Miller* v. *Searl and others*,† show pointedly, that as to judges of courts of record, the exemption (if they be of limited jurisdiction) is only where they act within that jurisdiction; and the *dictum* of Lord *Mansfield*, in *Mostyn* v. *Fabrigas*,‡ is of the same kind. The case of *Phelps* v. *Sill*§ is obviously a case where the court was acting within its jurisdiction, and the action was brought for a mere error in judgment.

There remains, then, only the authority of *Hawkins*. The passage cited from his book contains a *dictum* only of that writer. It is found under the title *Conspiracy*, and is to be understood as applicable only to cases where a judge is not responsible for a conspiracy. If he intended to lay down the doctrine in broad and general terms, as to the irresponsibility of judges of courts of record, he is contradicted by what he himself says, in another place. (B. 1. c. 28. s. 4, 5, 6.) "The judgment by virtue whereof any person is put to death must be given by one who has jurisdiction in the cause; for otherwise, both *judge* and officer may be guilty of felony." "And, therefore, if a court of common pleas give judgment on an appeal of death, or justices of the peace on an indictment for treason, and award execution, both the judges who give, and the officers who execute the sentence, are guilty of felony; because these courts having no more jurisdiction over those crimes than private persons, their proceedings thereon are merely void, and without any foundation. But if the justices of peace, on an indictment of trespass, arraign a man for felony and condemn him, and he be executed, the *justices only* are guilty of felony, and not the officer who executes the sentence; for the justices had a jurisdiction over the offence, and their proceedings were irregular and erroneous only, but not void." He is contradicted, also, by the opinion in the case of the *Marshalsea*, (10 *Co.* 66— 76.) and by *De Grey*, Ch. J. in *Miller* v. *Searle*,¶ that "in all the cases where protection is given to the judge giving an erroneous judgment, he must be acting *as judge;*" that is, he must be

*IN ERROR.*

ALBANY,
April, 1811.

YATES
v.
LANSING.

* 12 *Mod.* 886.
† 2 *Bl. Rep.* 1145.

‡ *Cowp.* 172.
§ 1 *Day's Cases in Error,* 315.

¶ 1 *W. Bl.* 1141.

*IN ERROR.*

ALBANY,
April, 1811.

YATES
v.
LANSING.

acting within his jurisdiction. If the court below meant no more
than that a judge, acting within his jurisdiction, is not to be re-
sponsible for an error of judgment, that doctrine is not denied.
It is laid down by *Coke,* and has never been disputed; but if the
*Chief Justice* means to go further, and say that a judge of a su-
perior court is not responsible, when acting beyond his jurisdic-
tion, then, we humbly contend his position is not law. The se-
cond position of the court goes to the absolute and universal irre-
sponsibility of the judges of · superior courts, whether they have
jurisdiction or not. It has no other support than the *dictum* of
Lord Chief Justice *De Grey,* and is contrary to the rule as broad-
ly laid down in 10 *Co.* 76. a. and to *Hawkins.**

* *P. C.* b. 1.
c. 28. s. 5.
*Bac. Abr.*
*Murder* and
*Homicide,*
(E. 1.)

All superior courts are, in some degree, limited in their juris-
diction, and there is no reason why they should be more protect-
ed than courts of inferior and more limited jurisdiction. If the
law grants this protection, in charity to the frailty of human judg-
ment, surely this charity ought to be extended to judges of infe-
rior courts, who possess less learning and experience to guide their
judgment.

The only distinction I know of, in this view of the subject,
between courts of superior and inferior jurisdiction, is the one laid
down in *Jennings* v. *Hankyn,*† where the party moved in arrest
of judgment, that the bond was in the *county palatine of Chester,*
and so the court of K. B. not having jurisdiction, the proceed-
ings were *coram non judice;* and the court said, " that the party
by pleading in chief, had admitted the jurisdiction, and could not
make the objection afterwards; for " it was not like a court of
limited jurisdiction, holding plea of a cause arising without it, for
there all is void as *coram non judice.*" With respect to inferior
courts, the judge must protect himself by expressly showing that
he acts within his jurisdiction; but as to superior courts, that shall
be presumed in their favour, unless the contrary be shown.

† *Carth.* 11.

But admitting the position, on the other side, to be true, it
can only be applied to actions, at common law, for *torts.* It is
not applicable to an action expressly given by statute for a penal-
ty. The statute, by giving the penalty, has said that the judges
shall not have that immunity.

The words " *done of record*" have no application to what a
judge does when acting beyond his jurisdiction. What a judge
does out of his jurisdiction is not done of record.

Then what is meant by the words of the statute, " having ju-

IN ERROR.
......
ALBANY,
April, 1811.

YATES
v.
LANSING.

risdiction of a cause?" Jurisdiction is the power to try or *jus dicere super causam*. It is not enough that the court should have jurisdiction of the "*subject matter;*" it must have jurisdiction of, or a power to try, the individual cause. Because the chancellor has jurisdiction in regard to *contempts* in his court, it does not follow that he had jurisdiction, after the discharge of Mr. *Yates*, of the particular cause. I do not mean to say whether the *chancellor*, after the discharge of Mr. *Yates*, might not have granted a rule upon him to show cause, and have proceeded against him for the contempt; but after the discharge, the particular cause was *res judicata*. It is unnecessary, therefore, to answer the question whether the discharge exculpated Mr. *Yates*, or not, or whether the *chancellor* might not have proceeded against him as in a new cause. What we contend for is, that the defendant had no right to commit again in the same cause. The defendant, however, chose to adhere to this particular cause, and to vindicate his authority, and prove his power superior to that of Mr. Justice *Spencer*. He proceeded with the law before him; he meant to test and try the law; and was willing to put his power at hazard on this point, and to risk the consequences of the statute.

As a judge, in vacation, has no power to enforce obedience to his order by any process for a contempt, the statute has provided the sanction of a penalty, in order to compel that obedience. Every person who refuses to obey the order of discharge is made liable to the penalty.

It is said, that the penalty is given only against persons acting ministerially or extrajudicially. But are not persons acting ministerially, and who are bound to obey, more protected than the judges? Shall the *officer* be liable to the penalty, and the *judge* escape? If the officer is bound, under the penalty, not to obey; is it not clear that the judge cannot have jurisdiction? A judge is only a judge, when he acts judicially or within his jurisdiction. If he acts beyond his jurisdiction, he is, as to such act, a *person*, not a *judge*.

Though in the first section of the act, the word *court* is used, yet where the *penalty* is given, the word *person* is used. If the chancellor, or judge of the supreme court, in vacation, upon view of the warrant of commitment or detainer, or on oath of a copy being denied, shall refuse to *allow* a writ of *habeas corpus*, he shall forfeit to the party aggrieved 1,250 dollars. The allowance of a writ of *habeas corpus*, we contend, is a *judicial* act; and the

*IN ERROR.*
......
ALBANY,
April, 1811.

YATES
v.
LANSING.
judge is compelled, under the penalty, to exercise his judicial discretion; and if he refuses to allow a *habeas corpus* to which the party is entitled, will an error of judgment protect him against the penalty? This, then, is contrary to the common law doctrine, that a judge is not responsible for an error of judgment. And does not the *fifth* section equally entrench on that doctrine, and make a judge liable for recommitting a person discharged under a *habeas corpus*, though he does it under a mistake? The penalty extends to every judicial character who should disregard the discharge; and without such a penalty, the power of a judge in vacation would be impotent and ineffectual. The acts says "any colourable pretence or variation in the warrant of commitment notwithstanding." A ministerial officer will not alter the warrant; but the court or judge who has the power of commitment. The penalty being given as the sanction of the judge's authority in vacation, it must be so construed as to be a competent sanction, and affect judges, otherwise, they would disregard the discharge. It follows, that when the judge has a right to discharge, the penalty attaches on whoever recommits. And it has been settled by this court that Mr. Justice *Spencer* had a right to discharge.

The consequences of the construction for which we contend have been depicted in strong colours; but suppose the act had said, in express terms, that no judge of the supreme court, or any other court, should recommit a person who had been discharged by *habeas corpus*, in vacation, those evil consequences would not have been supposed or apprehended.

LEWIS, Senator, was of opinion that the judgment of the supreme court ought to be affirmed, and gave his reasons at length.(*a*)

PLATT, Senator. In examining this interesting case, two cardinal points are presented :

1. Had the chancellor a right to recommit the plaintiff, after the discharge by Mr. Justice *Spencer?*

2. If he had no such right, is he liable for the penalty now claimed?

The consideration of the first question involves an inquiry :

1. Whether the original commitment by the chancellor was legal?

(*a*) The reporter, not being present at the time, is unable to state them.

2. Whether Mr. Justice *Spencer* had a right to revise the adjudication of the chancellor, in the matter of complaint against *John V. N. Yates;* and discharge the prisoner on *habeas corpus?*

3. Whether the recommitment of Mr. *Yates* by the chancellor, *after the actual discharge* by ·Mr. Justice *Spencer*, was lawful?

IN ERROR.
......

ALBANY,
April, 1811.

YATES
v.
LANSING.

Before I proceed to examine these questions, it is proper to notice a preliminary objection insisted on by the counsel for Mr. *Yates*. They contend that the door to these inquiries is now shut, by the decision of this court, at its last session, in the case of *John V. N. Yates* and *The People.*

I cannot admit the doctrine of *immutability* in the decisions of this court, to the unqualified extent claimed by the plaintiff's counsel.

The decisions of courts are not *the law;* they are only *evidence of the law.* And this evidence is stronger or weaker, according to the number and uniformity of adjudications, the unanimity or dissension of the judges, the solidity of the reasons on which the decisions are founded, and the perspicuity and precision with which those reasons are expressed. The weight and authority of judicial decisions depend also on the character and temper of the times in which they are pronounced. An adjudication at a moment when turbulent passions or revolutionary phrenzies prevail, deserves much less respect, than if it were made at a season propitious to impartial inquiry, and calm deliberation.

The peculiar organization and practice of this court, renders it difficult to establish a system of precedents. In the supreme court the judges confer together, compare opinions, weigh each other's reasons, and elicit light from each other. If they agree, one is usually delegated by the others, not only to pronounce judgment, but to assign reasons for the whole bench. But even in that court, and in the courts of *Westminster-hall*, the judges who silently acquiesce in the result, do not consider themselves bound to recognise as law all the *dicta* of the judge who delivers the opinion of the court.

In this court, the members never hold any previous consultation together; we vote, for the most part, as in our legislative capacity. Few assign any reasons, and fewer still give written opinions which may be reported. For these reasons, I think it would be extravagant and dangerous, to consider the *dicta* and opinions

IN ERROR.
......
ALBANY,
April, 1811.

YATES
v.
LANSING.

of a single member, as settling definitively the law of the land, on all the points on which he chooses to give opinions, or to assign reasons.

In the *Case of J. V. N. Yates*, at the last session, only one member (Mr. *Clinton*) gave a written opinion, or assigned reasons for *reversing* the judgment of the supreme court. (6 *Johns. Rep.* 496.) A majority of the members voted for reversing that judgment; but whether upon the grounds taken, and the reasons assigned by Mr. *Clinton*, it is impossible to know. It is certain that a majority agreed in the result; but there is no certainty that any two of that majority, grounded their opinions on any one of the various points that were discussed and relied on by Mr. *Clinton.*

One point insisted on in the eloquent opinion of that senator, was, that the recommitment by the chancellor was by *order*, and that it ought to have been by attachment. (6 *Johns. Rep.* 512.) This was a material question in the former record. It may be that the other members of the court who voted for the reversal of that judgment, rested their opinions on that point alone; and if so, that decision has no bearing on the present question.

This suit is for the penalty for recommitting after a discharge on *habeas corpus;* and the question is not as to the *mode*, but as to the *right* of recommitting. If the recommitment was " knowingly, contrary to the statute," it is immaterial whether it was by *order*, or by *attachment;* for the defendant is equally liable in both cases.

If that question were material in this case, it might be shown that *courts of record* may commit by *order*, or by *writ ;* but a magistrate, not sitting as a court of record, can commit only by *warrant*, under his hand and seal. (2 *Hale's P. C.* 122.  2 *Roll. Abr.* 559.  *Taylor* v. *Beal.*)

Considering the questions which now arise, as not necessarily prejudged by the former decisions of this court, I shall now proceed to examine them, on the general grounds of reason and authority.

The right of punishing for contempts by summary conviction, is inherent in all courts of justice, and legislative assemblies; and is essential for their protection and existence. It is a branch of the common law, adopted and sanctioned by our state constitution. The discretion involved in this power is, in a great measure, arbitrary and undefinable; and yet the experience of ages has

IN ERROR.
......

ALBANY,
April, 1811.

YATES
v.
LANSING.

demonstrated, that it is perfectly compatible with civil liberty, and auxiliary to the purest ends of justice.

The known existence of such a power prevents, in a thousand instances, the necessity of exerting it; and its obvious liability to abuse, is, perhaps, a strong reason why it is so seldom abused.

This power extends not only to acts which directly and openly insult, or resist the powers of the court, or the persons of the judges, but to *consequential, indirect and constructive contempts,* which obstruct the process, degrade the authority, or contaminate the purity of the court. (4 *Bl. Com.* 280. 2 *Hawk.* b. 2. c. 22. 1 *Com. Dig. Attachment,* A.)

The *officers* of the court are peculiarly subject to its discretionary powers, and may be punished in this summary manner, for oppression, extortion, negligence or abuse in their official capacity. (1 *Bac. Abr.* tit. *Attachment.* 2 *Hawk.* tit. *Attachment.* 3 *Atk.* 568.)

A contempt is an offence *against the court,* as an organ of public justice; and the court can rightfully punish it on summary conviction, whether the same act be punishable as a crime or misdemeanor, on indictment, or not. To challenge a senator or a judge, may, under circumstances, be a contempt; but is certainly indictable. A conviction on indictment will not purge the contempt; nor will a conviction for a contempt be a bar to an indictment. The offence may be *double;* and so are the remedy and the punishment. For instance, assaults in the presence of the court, *rescous,* extortion, libels upon the court or its suitors relating to suits pending, forging a writ, &c. are *indictable* offences; and certainly they are also *contempts.*

Contempts are never merged in statute offences, without express words for that purpose.

In this case it appears that a complaint was made to the chancellor against the plaintiff, by *Samuel Bacon,* a suitor, founded on his own affidavit, and the affidavits of *Peter W. Yates* and *Richard S. Treat,* charging that the plaintiff, being a master in chancery, filed a bill, on behalf of *Samuel Bacon,* and subscribed to it the name of *Peter W. Yates,* one of the solicitors of that court, without the knowledge or consent of *P. W. Yates;* and had acted as solicitor in the prosecution of the cause, under the assumed name of *P. W. Yates.* It also appears by the order of conviction, that the plaintiff " *was regularly required*" to answer this complaint before the chancellor; and that he did not appear to answer it.

IN ERROR.
......
ALBANY,
April, 1811.

YATES
v.
LANSING.

Whereupon, the chancellor made an order in the minutes of the court, " that the bill be dismissed, that the said *John V. N. Yates* pay all the costs accrued in the suit; and that the said *J. V. N. Yates* be committed *for his said malepractice and contempt.*" An attachment accordingly issued; and the plaintiff was arrested and imprisoned under it.

After reciting the facts charged against the plaintiff in the order of conviction, and in the attachment, these words are added, " contrary to the statute in such case made and provided, in wilful violation of his duty as master, and in contempt of the authority of this court."

The question here presented is, whether the chancellor had a right to make this order, and to issue this attachment?

I am of opinion that the order is clearly a conviction for a *contempt*, and in legal construction imported nothing more. The words " contrary to the statute, in wilful violation of his duty as master, and in contempt of the authority of this court," in the connection in which they stand, are mere *expletives*, showing a strong sense of the indignity offered to the court; but are not a substantive ground of conviction. If those words had been omitted, the conviction would have been complete; and I think its legal import is the same *with* or *without* those words.

Suppose that instead of those words, the order had stated that the facts charged were " contrary to the precepts of our holy religion ;" would it be contended that the order was void, and that the chancellor had usurped ecclesiastical powers ? Suppose he had stated that the conduct of Mr. *Yates* was " contrary to the laws of all civilized countries," would it be said he had assumed universal jurisdiction under those laws ? *Utile per inutile non vitiatur.*

The attachment recites the order or adjudication of conviction, and " therefore" commands the sheriff to imprison *John V. N. Yates*, " until the further order of our said court."

I consider this writ as an attachment for a contempt; and I think it a distortion of its plain import, to say that it implies any assumption of criminal jurisdiction, or that the chanceller held cognisance of, or meant to punish, the acts complained of, as a statute offence.

That the acts of fraud, imposition and extortion, of which Mr. *Yates* was so convicted, amounted, in judgment of law, to a highhanded contempt, I have no doubt; and that it was the right and the duty of the chancellor to punish him for it, and to compel

IN ERROR.
........
ALBANY,
April, 1811.
~~~~
YATES
v.
LANSING.

him *summarily*, to reimburse the money he had extorted from the suitor, is equally clear.

It is contended that the attachment is illegal, because it was founded on conviction without an examination on interrogatories.

To this objection several answers occur: 1. It does not appear from the attachment, whether there was such an examination or not; nor does the law or usage require that the whole proceedings which led to the conviction, should be recited in the attachment.

2. If we recur to the conviction, or order for the attachment, it appears that Mr. *Yates* refused to answer the complaint, "although regularly required so to do;" and I think such refusal to answer, is not only a waiver of the right of being examined on interrogatories, but an admission that the complaint was well founded.

3. That the chancellor had a right to dispense with such examination, if in his judgment the proof by affidavits is sufficient in itself, and of such credit, as that a denial by the party accused, under oath, would not countervail the affidavits. (*King* v. *Vaughan, Doug.* 516. 4 *Bl. Com.* 284.)

4. We are not now deliberating on an appeal from chancery. We must confine ourselves to the record brought here by the writ of error. The only question is, whether the judgment of the supreme court is right; and, of course, we have no more power to examine the proceedings which led to the conviction, or the grounds of the adjudication in chancery, than the supreme court had. If there was no essential defect on the face of the attachment, and it purported to be an attachment for a contempt, we are bound to presume that the conviction on which it issued was regular and well founded.

The last objection to the original commitment is, that it was " until the further order of the court;" and, therefore, it is not definite and terminable, either by the efflux of time, or on the doing of some act by the prisoner.

The object of this commitment was to compel remuneration to the injured suitor; and also to punish Mr. *Yates* for contemning the authority of the court, and polluting the streams of justice. It was impossible to foresee when he would indemnify the suitor, and make satisfactory atonement for his affront to public justice; there seems, therefore, an obvious propriety in directing the im-

IN ERROR.
......
ALBANY,
April, 1811.

YATES
v.
LANSING.

prisonment " until the further order of the court." It is equiva-
lent to saying, as in common warrants, " until he be delivered by
due course of law." It is, in fact, as definitive as the nature of the
case would admit; for if it had been " until he makes satisfaction
to the injured party, and acknowledges his contrition for his of-
fence," the court must, at last, judge of the compliance; and it
would in either case be, in effect, during the pleasure of the court.

I think it, however, a sufficient answer to say, that the prece-
dents uniformly agree with the form of this attachment, in that re-
spect, and that the established usage in all our courts, and in the
*English* courts, distinctly traced back to the *Year Books,* also
corresponds with it. This long usage proves that it is wise and
safe. But if it be in itself wrong, we have a right to apply the
maxim, *communis error facit jus.*

The commitment of *George Clarke* for a contempt, at the last
session, was " during the pleasure of the senate." It has been
said that " such an imprisonment ceases with the adjournment of
the legislature, and is, therefore, terminable on the happening of
that event." (Opinion of *Clinton,* Senator, 6 *Johns. Rep.* 506,
507.) But to this it may be answered, that the imprisonment
does not *necessarily,* or *of course,* cease with the adjournment.
The prisoner can then be released *only on habeas corpus ;* and
I trust it will not be contended that a commitment is legal,
wherever it leaves the prisoner liable to a discharge on *habeas
corpus.* Besides, the adjournment of the legislature depended on
their own volition, subject only to the right of prorogation by the
governor. It was, therefore, an imprisonment *during pleasure,*
in the largest sense, and not terminable by the efflux of time.
There was no certainty that the senate would ever adjourn. The
house of assembly expires annually, but the senate exists in per-
petuity.

I have now arrived at the conclusion that the original imprison-
ment of Mr. *Yates* was a *legal commitment,* upon a conviction
for a *contempt.*

The next question is, whether Mr. Justice *Spencer* had a right
to discharge Mr. *Yates* on *habeas corpus,* from his imprisonment
under the attachment of the court of chancery ?

Serjeant *Hawkins* (b. 2. c. 15. s. 73. 76.) shows, that the
superior courts pay the highest regard to each other's decisions,
and will presume them to be agreeable to law, unless the contrary
expressly appears.

IN ERROR.
......
ALBANY,
April, 1811.
YATES
v.
LANSING.

Since the violent contest between the court of chancery and the king's bench, in the reign of *James* I. the *English* authorities uniformly show a scrupulous forbearance in their courts to interfere with each other's proceedings, in matters of contempt. The *Case of Chambers* (*Cro. Car.* 168.) exemplifies this remark. He was committed for a contempt, and upon being brought into the king's bench, on *habeas corpus*, he was remanded, and the court said " it is not the usage of this court to deliver one committed by the decree of one of the courts of justice." Such has been the uniform tenor of *English* decisions down to the era of our independence. This principle has been so fully recognised by our courts, that no question has arisen upon it before the present case. It is founded on this strong reason, that these superior courts are *coördinate.* Equal confidence is reposed in their learning and integrity; and it is, therefore, unfit that one should assume a right to judge of the other's proceedings, especially as the constitution has provided a tribunal for the express purpose of correcting their errors.

Such an exercise of power by the *supreme court* would distort the symmetry and proportion of our system of appellate jurisdiction; but the deformity is still more glaring when the power is exercised by a *judge in vacation.*

The case of *Gist* v. *Bowman,* (2 *Bay's Rep.* 182.) in the supreme court of *South Carolina,* in the year 1798, bears a strong analogy to the present case. *Bowman* was committed for a contempt, by an *order* of one of the three chancellors, who compose the court of chancery in that state; and being brought before the supreme court, on *habeas corpus,* a question was made whether *one* of the three chancellors was *competent to make such an order of commitment;* and it was unanimously decided that the prisoner was not entitled to be discharged by the common law judges; that the *habeas corpus* act did not embrace the case; that the supreme court had no jurisdiction, and that they ought to refer the question to the court of chancery. This doctrine is great authority, because it was made by the highest tribunal of a sister state, whose civil institutions are congenial with our own.

It seems to be conceded that a judge *in vacation* had no power, at common law, to allow a *habeas corpus,* or to make any order in relation to it. His power, in that respect, is derived solely from the statute called the *habeas corpus* act. Judge *Spencer,* in this

IN ERROR.
......
ALBANY,
April, 1811.
YATES
v.
LANSING.
instance, marked the writ "*by statute*," and thereby evinced that he claimed jurisdiction under the statute only.

I cannot perceive any difference between our *habeas corpus* act and that of *Great Britain*, in relation to the point now before us. Whether a judge in vacation has any powers under this statute, *other than to* bail persons committed for trial, or to keep the peace, and answer indictments, is a question which, perhaps, need not be decided in this cause. There seems, however, strong ground to conclude, that his power " extends only to cases of commitment for such criminal charge as can produce no inconvenience to public justice, by a temporary enlargement of the prisoner; all other cases of unjust imprisonment being left to the *habeas corpus* at common law," which can only be issued in term. (3 *Bl. Com.* 137. 10 *Mod.* 429.) It is, however, very clear from the express exceptions in the statute, that a judge *in vacation* has no right to discharge " persons convict, or in execution by legal process."

In examining the original commitment by the chancellor, my judgment is satisfied, that it was neither *more* nor *less* than a commitment on a conviction for a *contempt*. I am, therefore, obliged to conclude that the decision of his honour Judge *Spencer* was erroneous on that point. I think Mr. *Yates* was, in the true sense of the 3d section of the *habeas corpus* act, " a person convict, or in execution by legal process," and, therefore, expressly within the exception to the powers given to the judge by the statute under which he discharged the plaintiff.

Mr. *Yates* was, however, *actually discharged* by Judge *Spencer;* and this brings me to the next inquiry, whether the recommitment by the chancellor, *after the actual discharge* by Mr. Justice *Spencer*, was lawful?

The 5th section of the *habeas corpus* act declares, " that no person who shall be set at large upon any *habeas corpus*, shall be again imprisoned for the same offence, unless by the legal order or process of the court wherein he is bound by recognisance to appear, or *other court having jurisdiction of the cause.*"

I think Mr. Justice *Spencer* exceeded his jurisdiction in discharging Mr. *Yates*, and, of course, that discharge was unauthorized and void. It had no more legal operation or effect, than if the *habeas corpus* act had never existed; and the right of recommitment by the chancellor rests on the same footing as if Mr. *Yates* had been discharged on the order of any private citizen.

IN ERROR.
......
ALBANY,
April, 1811.

YATES
v.
LANSING.

In discharging Mr. *Yates,* Judge *Spencer* acted *ministerially,* or if *judicially,* he acted as a court of *special* and *limited* jurisdiction under the statute, and the proceeding was *coram non judice.*

In my judgment, the chancellor had originally " jurisdiction of the cause," that is, of the *cause of commitment,* which was " for malepractice and contempt;" and, of course, this presents a case clearly within the exception in the fifth section of the statute.

If it be a case within that exception—if Judge *Spencer* acted *extrajudicially,* in discharging the prisoner, it seems to me against sound legal discretion to contend that such a discharge, by a person having no right to make it, can be effectual and conclusive to rescue a prisoner in execution for a contempt, and to exculpate him from the guilt established by his conviction.

The court of chancery not only had " jurisdiction of the cause," but *exclusive jurisdiction.* No court can punish for contempts of another court. And if the discharge by the judge is conclusive, whether right or wrong, and whether he had jurisdiction or not, it must result, that a man who stands convicted of a gross contempt against the court of chancery, and a daring affront to public justice, may, without satisfaction, and without pardon, escape all punishment, and bid defiance to all the constituted authorities of the state.

Such a doctrine would go to prove that a judge in vacation has not only a power to revise the decisions of every court in the state, but that, *in effect,* he may exercise the power of pardoning convicts. Suppose a person convicted of murder, or treason, and on writ of error the supreme court pronounce judgment of death, and the executive refuses to respite the sentence, can the idea be tolerated, that a judge of the supreme court, in vacation, or a recorder of *New-York, Albany* or *Hudson,* (who have equal powers,) may conclusively discharge the culprit on *habeas corpus,* at the moment of execution? Such a despotic control over judicial decisions, and executive discretion, would, indeed, secure the personal liberty of *one man,* but its inevitable tendency would be to *enslave millions.*

For these reasons, I think the chancellor had a perfect right to recommit Mr. *Yates,* for the same offence. He was equally liable to recommitment as if he had escaped from prison, or been rescued by violence.

But if I am mistaken in every position which I have laid down,

there still remains this solemn and important question; is the defendant responsible, in this action, for acts done by him officially and judicially as chancellor of this state?

In order to give a just construction of the fifth section of the habeas corpus act, which gives the penalty claimed by the suit, it is necessary to examine the law generally in regard to the responsibility of judicial officers.

Serjeant *Hawkins* (b. 1. c. 7. s. 6.) lays down this general rule, " that the law has freed the judges of all courts of record from all prosecutions whatsoever, except in the parliament, for any thing done by them openly in such courts as judges." The *English* authorities, from the *Year Books* down to the present day, uniformly establish and fortify this doctrine, that where courts of special and limited jurisdiction exceed their rightful powers, the whole proceeding is *coram non judice,* and all concerned in such void proceedings are liable to an action by the party injured. (*Case of Marshalsea,* 10 *Co.* 68. *Terry* v. *Huntingdon, Hardr.* 480.) But in the case of *Miller* v. *Seare,* (2 *Bl. Rep.* 1141.) Lord Chief Justice *De Grey* said " that the judges of the courts of general jurisdiction were not liable to answer personally for their errors in judgment. The protection as to them is absolute and universal; with respect to the inferior courts, it is only while they act within their jurisdiction."

In support of this doctrine, I refer generally to *Book of Assise,* 27 *Edw.* III. pl. 15. 9 *Hen.* VI. 60. pl. 9. 9 *Edw.* IV. 3. pl. 10. *Floyd* and *Barker,* 12 *Co.* 23. *Aire* v. *Sedgwick,* 2 *Roll. Rep.* 199. *Hammond* v. *Howell,* 1 *Mod.* 184. *Groenvelt* v. *Burnwell,* 12 *Mod.* 286. 1 *Salk.* 396. 1 *Ld. Raym.* 454. *Miller* v. *Seare,* 2 *Bl. Rep.* 1145. *Mostyn* v. *Fabrigas,* *Cowp.* 172.

This rule has been invariably acknowledged as law in this state; (2 *Caines' Rep.* 312.) and has been recognised and supported by our sister states. In the case of *Phelps* v. *Sill,* in the supreme court of *Connecticut,* (1 *Day's Cases in Error,* 315.) a suit was brought against a judge of probates, for omitting to take security from a guardian, and the court held that the action would not lie. They said, " It is a settled principle that a judge is not to be questioned in a civil suit for doing, or for neglecting or refusing to do, a particular official act, in the exercise of judicial power."

In the case of *Lining* v. *Bentham,* in the supreme court of *South Carolina,* (2 *Bay's Rep.* 1.) in 1796, it was unanimously de-

IN ERROR.
......
ALBANY,
April, 1811.
YATES
v.
LANSING.

cided that a justice of the peace may commit for a contempt; that his warrant of commitment under his hand and seal was the best evidence of the contempt; and that he was not liable to an action for what he did in his judicial capacity, though he was subject to indictment if he acted oppressively.

The same court, in 1796, in *Brodie* v. *Rutledge,* (2 *Bay's Rep.* 69.) held that it was a well-settled rule of law, that no suit would lie against a judge, for any judgment rendered by him in his judicial character; though liable to impeachment.

Our statute is a transcript from the *English habeas corpus* act, and Serjeant *Hawkins,* in his learned exposition of that statute, (*Hawk.* b. 2. c. 15. s. 24.) says, " the *habeas corpus* act makes the judges liable to an action at the suit of the party *in one case only,* viz. in refusing to award a *habeas corpus ;* and seems to leave it to their discretion, in all other cases, to pursue the directions of the act in the same manner as they ought to execute all other laws, without making them subject to the action of the party, or to any other express penalty or forfeiture."

The fifth section gives a penalty against " *any person* who shall knowingly, contrary to this act, recommit or imprison for the same offence, or pretended offence, any person so set at large," &c.

I consider this section as having no application to the *chancellor,* or *judges,* in their judicial character. This penalty applies only to magistrates and others who act *ministerially* as conservators of the peace, or who commit for trial, or to answer indictments.

If the penalty for recommitting applies to the chancellor, while sitting as a court of chancery, it must equally apply to all the judges of the supreme court sitting together in term; and if the penalty be incurred by the supreme court, composed of five judges, how are they to be sued, jointly or severally ? If the judges, or a majority of them, are liable to be sued as a court, before what tribunal are they to be sued ? If in the courts of common pleas, do the parties lose the benefit of a writ of error to the supreme court? Or are the judges to sit in judgment on themselves ? These absurd consequences evince that, *as courts,* they were never intended to be made responsible to the party in a private suit. Consider them liable in their ministerial capacity only, and the construction of this statute accords with the established and revered principles of the common law.

The authorities cited show the general reason and policy of the

IN ERROR.
......
ALBANY,
April, 1811.

YATES
v.
LANSING.

law in maintaining *judicial inviolability;* and surely we ought not to adopt a construction of this statute abhorrent to every principle of justice and sound policy, unless that interpretation be imperiously required by the express and unequivocal terms of the statute. In this case the defendant acted in his judicial character, " as chancellor, and not otherwise." There is no pretence that he acted from corrupt motives; on the contrary, it is expressly admitted that his intentions were pure.

That a chancellor or judge of the supreme court shall be compelled to decide new and difficult questions of law or equity, at the peril of incurring a severe penalty, if they happen to decide wrong ; that pure intentions and honest endeavours to perform their official duties shall afford them no protection, are propositions repugnant to reason and humanity, and cannot be law.

The *habeas corpus* act is justly prized as one of the bulwarks of freedom, and can be endangered only by its *misapplication* and *abuse.* Let us beware, that in our zeal for securing personal liberty, we do not destroy the virtuous independence and rightful authority of our courts of justice, and thereby subvert the foundations of social order.

So long as our courts are *pure, enlightened* and *independent,* we shall enjoy that greatest of earthly blessings, *a government of laws;* but whenever these tribunals shall cease to deserve that character, the standard of justice and civil liberty must give place to the sceptre of a tyrant.

My opinion is, that the judgment of the supreme court ought to be affirmed.

PARIS, Senator, concurred.

BRETT, BRUYN, HAIGHT, HALL, HOPKINS, HUMPHREYS, MARTIN, PHELPS, STEARNES, WHITE and WILLIAMS, Senators, were also of opinion that the judgment of the supreme court ought to be *affirmed,* but did not state their reasons.

CLINTON, Senator. Great pains and much argument have been employed by the counsel for the defendant, to overthrow a decision made by this court at the last session, and to demonstrate, not only that the conclusions, but the reasoning adopted on that occasion, were untenable and fallacious. Although this course is unprecedented and totally unwarranted, yet the patience of the

court was yielded without reluctance to a protracted discussion, which terminated in establishing what was never questioned: that the court of chancery, as well as every other court, has a right to punish contempts, and to apply the rod of chastisement to the conduct of its officers. But that chancery has the power of punishing for crimes; that a violation of a statute is not a misdemeanor, and that judicial irresponsibility is to ride over the rights of the people, and the constitution of the land, are positions which yet remain totally unestablished. Although I am willing to yield every tribute of applause to the erudition and ingenuity of the counsel employed for the defendant, yet I cannot concede that they have succeeded in overturning the decision of this tribunal. If I could conceive it relevant to the discussion to enter into a defence of the judgment of the court, I should not consider it attended with any difficulty to present a complete vindication; but a measure of this kind would be an admission that a court might, at any time, and at all times, review its own decisions, or the decisions of its predecessors, and pronounce the law to be different, at different periods and on different occasions, thereby entirely destroying the authority of precedent, converting the judge into the legislator, and reducing us to a situation where we might truly say, " *Misera est servitus ubi jus est aut vagum aut incognitum.*" In the case of *Hartshorne and others* v. *Sleght*, (3 *Johns. Rep.* 562.) it was insinuated, with a view of obtaining the benefit of a second writ of error, that courts might and ought to review their decisions. On that occasion, I thought it my duty to resist a doctrine which I then considered, and still do consider, as of the most pernicious tendency; and I animadverted upon it in the following words: " This cause is now before us, and it does not avail the plaintiff in error to say that courts may and ought to review their own decisions. This court will hardly admit that doctrine. A motion for a rehearing after judgment has never been made or sustained, when a cause has been once settled. When a decision has been pronounced here, the law is established; and no power can change it but the legislature. The rule becomes binding, not only upon all subordinate tribunals, but upon this court."

A contrary determination would involve not only the greatest absurdities, but the greatest mischiefs. Inferior tribunals would be without chart or compass; the authority of decisions would be

IN ERROR.
......
ALBANY,
April, 1811.

YATES
v.
LANSING.

IN ERROR.

ALBANY,
April, 1811.

YATES
v.
LANSING.

done away, and, one fourth of the senators of this court changing every year, adjudications would fluctuate with the mutations of members. What was law yesterday, would not be law to-day. It has never been known, at least in a court of *dernier resort*, that its decisions have been altered or revised in any other way than by the legislative power; and even in courts not of *dernier resort*, if a different course has been, at any time, pursued, it has been remarked as a singularity. And when Lord *Kenyon* attempted to question the authority of an adjudication of his predecessor, it was considered as an anomaly, not as a rule in the conduct of judicial tribunals. *Stare decisis et non quieta movere*, is a maxim justly held in the highest veneration.

Admitting, then, the authority of the adjudication of last session, we have next to inquire into its bearing upon this cause. The present suit is brought to recover a penalty under the fifth section of the *habeas corpus* act, which is in the following words: " And be it further enacted, that no person, who shall be set at large upon any *habeas corpus*, shall be again imprisoned for the same offence, unless by the legal order or process of the court, or other court having jurisdiction of the cause. And if any person shall knowingly, contrary to this act, recommit or imprison, or cause to be recommitted or imprisoned, for the same offence or pretended offence, any person so set at large, or shall knowingly aid or assist therein, he shall forfeit to the party aggrieved 1,250 dollars, any colourable pretence or variation in the warrant of commitment notwithstanding."

The decision of last session was on a writ of error, brought on a judgment on a *habeas corpus*. It appeared that the plaintiff in this cause was committed by the chancellor. That he was discharged by a judge, in vacation, under the *habeas corpus* act; reimprisoned by the chancellor, after such discharge; and that, finally, the case was brought before the supreme court, in which three of the five judges decided in favour of the legality of the imprisonment; and that this court reversed that decision, considering the original imprisonment unjustifiable, and, of course, the incarcerations as aggravations of the first wrong.

It is not, then, to be wondered at, that the counsel for the defendant should have pointed their principal attack at that decision of this tribunal. If that adjudication was right, it is difficult to conceive how the defendant can escape from the penalty of the statute; and there can, indeed, be no door of retreat, unless we

IN ERROR.
......
ALBANY,
April, 1811.

YATZS
v.
LANSING.

suppose, that it was founded exclusively on the illegality of the original commitment, and on the judgment of the supreme court, without any reference to the proceedings under the *habeas corpus* act, or unless we take the broad ground of judicial irresponsibility, or the more narrow ground of the inapplicability of the statutory prohibition to courts in general, especially to the court in question. On the supposition that our decision cannot be questioned, denied, or explained away, as to its general result, these are the only three points which can be brought to bear in favour of the defence.

As to the first point, it is explicitly denied that the decision was not in part bottomed on the proceedings under the *habeas corpus* act. The only opinion delivered in coincidence with the judgment of the court, took notice at large of that branch of the subject, and considered a judge in vacation a competent tribunal in such case; his discharge as final and conclusive, and a reimprisonment, after that discharge, as an infraction of the statute. It would, therefore, in strictness, not be necessary to revive this discussion, but as it has been much laboured, I shall bestow a few remarks upon it.

It appears obvious to me, that the *habeas corpus* act was intended to invest the same power in a judge in vacation that the supreme court has in term. The same limitations of power that controlled their proceedings at common law were applied to the judge under the statute; and as he is, in this respect, a creature of the statute, it became necessary to define the power in the act communicating it. The common law restrictions upon the power of the court were imposed upon that of the judge; and if he cannot take cognisance of other commitments than for crimes, if he cannot meddle with convictions whether legal or illegal, they are equally restrained; and, perhaps, there is only one case in which the court will interfere in favour of a prisoner in which a judge will not, and that is in case of dangerous sickness, when the laws of humanity require their interposition; and in a situation like this, the common law, in a spirit of benevolence, has planted no check against judicial discretion.

If the power of the judge is only limited to commitments for crimes, as has been zealously contended for by the defendant, it would not bear him out in this case, because the conviction was for a crime, and therein principally consisted its illegality; but this construction is not only in the teeth of existing practice, but

IN ERROR.
......
ALBANY,
April, 1811.

YATES
v.
LANSING.

in the face of the statute. It cannot be denied but that the power of the judge, or commissioner, is commensurate with all unjust imprisonment, except in treason and felony, and this has been the invariable understanding, and undisputed practice, until the agita- tion of this cause has elicited new and extraordinary doctrines. The object of the statute would be greatly frustrated, if a judge has no right to take notice of illegal convictions; if he is con- fined to crimes only, what remedy is there for all illegal imprison- ments in other respects? Must the injured party wait until the sitting of the supreme court? And will damages to any extent, in an action for a false imprisonment, atone for a violation of feel- ing, and personal liberty, and an infraction of the great rights which distinguish a free man from a slave? Suppose a child is torn from his parent, a wife from her husband, a citizen from his habitation, and placed in close confinement, is there no court of summary jurisdiction authorized to grant relief? Is he to be told that he must wait until the supreme court convenes, which may be in not less than three months? And are we to suppose that our law would be silent on a point of so great and of such obvious importance? But the law is not silent; it arms the judge with power over all persons imprisoned; whereas that of *Great Britain* is confined to crimes. Because the two statutes vary in that impor- tant respect, and because ours has not a preamble like that of the *British* statute, and because in the last edition of the revised laws, a preamble was struck out, it is maintained that they are similar, or, in plain *English*, that they are alike, although they differ.

At the last session, it was earnestly contended not only by the bar, but by some of the bench, that as long as the conviction was not quashed or reversed, no court or judge could grant relief by *habeas corpus*. But the leading case of *Bushell*, in C. B. and a train of decisions founded upon it, which were produced and relied on, seem to have imposed silence on this head. But it is now asserted that a judge is restrained from interfering with any *conviction* whatsoever, on account of the words "other than per- sons convict, or in execution by legal process." A commitment in consequence of a conviction is an execution. If a judge has a right to take cognisance of an illegal execution, he has, of course, a right to notice the case of a person convict, because the execu- tion is bottomed on the conviction, and the words *by legal pro- cess*, refer not only to the legality of the execution, but to the legality of the conviction. Where the execution is not legal, the

IN ERROR.
......
ALBANY,
April. 1811.

YATES
v.
LANSING.

judge may relieve. Why not, then, where the conviction is illegal. The conviction does not incarcerate; it is the *mittimus* emanating from the conviction; and in the case before us, the relief granted was on the attachment, which was the execution confining the prisoner. That the statute authorizes the judge to interfere in cases of execution, other than executions by legal process, cannot be questioned, nor is it attempted to be denied. But how many cases can be shown where the judges have relieved in this summary way? Some have been particularly referred to. Those of *Benedict Lewis* and *Hannah Clap*, fell under the cognisance of the *Chief Justice*, in which he very properly and efficiently extended relief. The judge is unquestionably constituted a tribunal to examine the legality of the conviction and the execution. If they are according to law, he is restrained from interfering; but if they are, in his opinion, illegal, then he may relieve the prisoner; and this being the case, it is immaterial whether his decision is correct or not, as it respects the power of chancery, or any other tribunal or person, to reimprison, except the court that has power to try the cause.

But it is maintained that admitting the illegality of the imprisonment, yet the chancellor, acting as a court, is irresponsible, particularly to private prosecutions or indictments; and a variety of learning and not a little declamation, have been displayed in support of this position.

The *Chief Justice*, in his elaborate opinion, has exhausted all that can be said on this subject; and in noticing it, I shall certainly treat him with all the respect, so justly due to his high station and eminent talents. Whether he has travelled out of the usual routine of judicial conduct, to support a cause which was not then debated by the plaintiff, is not a material point for inquiry, because, in giving an opinion, he had undoubtedly a right to assign his reasons at large; and because, we have every reason to believe he considered it his duty to vindicate judicial irresponsibility to its full extent, from a sincere conviction that it is connected with the due administration of justice, and with the best interests of the country.

Where a judge acts within his jurisdiction, it would entirely destroy his independence and his usefulness, if he were liable to answer to individuals who might conceive themselves aggrieved by his decisions. It is the lot of humanity to err, and what man would take an office, which would expose him, in the execution of

*IN ERROR.*
......
ALBANY,
April, 1811.

YATES
v.
LANSING.

its duties, to the prosecutions of unfortunate or dissatisfied suitors? No judge would be able to stand up against the expense and vexation that would result from this position; and it is no less unjust than impolitic, to expose him to amenability for errors, to which we are more or less subject. This is the true principle and the true reason, why judges, acting as judges, that is, acting within the sphere of their delegated authority, are protected in *England.* It is true that a judge is held to be responsible to the king. The king being the fountain of honour and justice, and the judges being the delegated ministers of the judicial power, it is presumed that they ought to answer to him only, as their principal and constituent. But this can never be applicable here; and, in *England,* it cannot apply to cases where the judge has no jurisdiction.

The case of *Miller* v. *Seare* (2 *Bl. Rep.* 1141.) was an action of false imprisonment, brought against three commissioners of bankruptcy. Ch. J. *De Grey* decided that the commissioners had no power to commit, and were, therefore, liable. In giving the opinion of the court, he took occasion to say "that the judges, in the king's superior courts of justice, are not liable to answer personally for their errors in judgment; and this, not so much for the sake of the judges, as of the suitors themselves." "In courts of special and limited jurisdiction, having power to hear and determine, a distinction must be made. While acting within the line of their authority, they are protected as to errors in judgment; otherwise they are not. So, in Dr. *Bonham's Case,* false imprisonment lay, because they had exceeded their authority. In Dr. *Groenvelt's Case* it did not lie, because they were within their jurisdiction. In Dr. *Bourchier's Case,* and the case of *Terry* and *Huntingdon,* in *Hardres,* it lay, because of the excess of jurisdiction." "In all cases (continues Ch. J. *De Grey*) where protection is given to the judge giving an erroneous judgment, he must be acting *as judge.* The protection in regard to the superior courts is absolute and universal; with respect to the inferior, it is only while they act within their jurisdiction." This is the authority principally relied on, and it will be at once perceived on how slight a foundation. It was a mere *obiter* opinion, not applicable to the case before the court; but if critically examined, it is susceptible of a construction, not incompatible with truth. The maxim of Ch. J. *De Grey* is, that in order to extend protection to the judge giving an erroneous judgment, he must be acting as *judge.* Now can a

man be said to act as a judge, when he has no jurisdiction ? Will <span>IN ERROR.</span>
the mere forms or symbols of office, the mere occupation of a ju-
dicial bench, constitute a judge ?   Suppose the *Chief Justice*  <span>ALBANY,
April, 1811.</span>
were to go into his court, and declare himself possessed of chan-
cery powers, and commit a man for not answering a bill in  <span>YATES
v.
LANSING.</span>
chancery, and should be attended by his clerk and officers of
justice, and open his court with his usual formalities, would any
man have the hardihood to say that this pageantry and assump-
tion would protect him from amenability ?   Unless it can be
supposed that the superior courts in *England* and this country,
have jurisdiction coextensive with every object of judicial
cognisance, then we must admit that their jurisdiction is not
unlimited, and that, consequently, they may act beyond it, and
ought to answer for it.   Their jurisdiction is unlimited as to place,
but not as to the quantity of judicial power.   The process of
chancery and the supreme court, runs into every county of the
state ; but their authority does not reach every mode of action,
every source of litigation.    And, therefore, to say that those
courts shall be protected in all cases, whether they act within their
jurisdiction or not, and that inferior courts shall only be shielded
when they act within their jurisdiction, is establishing a difference
without a reason, and is investing the higher courts with arbitrary
and discretionary power, over the lives, liberties and property of
our citizens.   The case of *Hammond* v. *Howell, Recorder of
London*, (2 *Mod.* 219.) was an action brought against the latter,
as commissioner of *oyer and terminer*, for fining and imprisoning
a juror on account of a verdict.   The court held that an action
would not lie against a judge for what he does judicially, though
erroneously ;  that the old *Old Bailey* had jurisdiction of the
cause, and might try it ;  and had power to punish a misdemeanor
in the jury ;  and that, although the recorder acted wrong, yet, as
he acted judicially, he was not liable.   This, although carrying
the principle of immunity to its utmost latitude, and although pro-
bably misapplied, yet may be considered as intended to come
within the general rule of the necessity of jurisdiction, in order to
furnish protection. In the celebrated case of the *Marshalsea*, (10
*Co.* 69. 76.) the doctrine of Ch. J. *De Grey* is contradicted, for " it
was resolved that the action well lies against the defendants ; and a
difference was taken when a court has jurisdiction of the cause,
and proceeds *inverso ordine*, or erroneously, there the party who
sues, or the officer or minister of the court, who executes the

*IN ERROR.*
......
ALBANY,
April, 1811.

YATES
v.
LANSING.

precept or process of the court, no action lies against them." But when the court has not jurisdiction of the cause, there the whole proceeding is *coram non judice,* and actions will lie against them without any regard to the precept or process, and, therefore, the rule cited by the other side, " *Qui jussu judicis aliquod fecerit* (but when he has no jurisdiction *non est judex) non vide- tur dolo malo fecisse quia parere necesse est,* was well allowed, but it is not of necessity to obey him, who is not judge of the cause, no more than it is a mere stranger, for the rule is *judicium a non suo judice datum nullius est momenti;* and that fully ap- pears in our books; and, therefore, in the case betwixt *Bowser* and *Collins,* in 22 *Edw.* IV. 33. c. there *Pigot* says, if the court has not power and authority, then their proceeding is *coram non judice.* As if the court of common pleas holds plea in an appeal of death, robbery, or any other appeal, and the defendant is at- tainted, it is *coram non judice, quod omnes concesserant."* I hope it will not be contended that a ministerial officer, obeying the or- ders of his superiors, is liable, when the persons giving them are not. The rule in such cases is, that " where the subject matter of any suit is not within the jurisdiction of the court applied to for redress, every thing done is absolutely void, and the officer executing the process is a trespasser. But where the subject matter is within the jurisdiction of the court, but the want of ju- risdiction is to the person or place, unless the want of jurisdiction appears on the process to the officer who executes, he is not a trespasser." (*Esp. Dig.* 391.) The court of common pleas is a superior court of general jurisdiction, and yet it is, in the case of the *Marshalsea,* explicitly asserted, that an appeal of death, rob- bery, or any other appeal, would be *coram non judice,* and void; and, as has been justly observed, that if a judgment given by a judge is void, the correlative is true that it is not given judicially, and if it is pronounced by a man bearing the office of a judge, yet, if it is rendered *coram non judice,* it is of no more force or consideration, than if given by a person who is not a judge.

The *Chief Justice* has triumphantly quoted Serjeant *Hawkins* on this subject, but he has inadvertently omitted a very material part. The whole section is as follows: " And as the law has ex- empted jurors from the danger of incurring any punishment in re- spect of their verdict in criminal causes, it hath also freed the judges of all courts of record from all prosecutions whatsoever, except in the parliament, for any thing done by them openly in

*IN ERROR.*
......
ALBANY,
April, 1811.

YATES
v.
LANSING.

such court as judges; for the authority of a government cannot be maintained, unless the greatest credit be given to those, who are so highly intrusted in the administration of public justice; and it would be impossible for them to keep up in the people that veneration of their persons, and submission to their judgments, without which it is impossible to execute the laws with vigour and success," (thus far the *Chief Justice* has quoted, but *Hawkins* proceeds,) " if they should be continually exposed to the prosecutions of those whose partiality to their own causes would induce them to think themselves injured ; yet if a judge will so far forget the honour and dignity of his post, as to turn solicitor in a cause which he is to judge, and privately and extrajudicially tamper with witnesses, or labour jurors, he hath no reason to complain, if he be dealt with according to the capacity to which he so basely degrades himself."

The last part of the sentence, which the *Chief Justice* omitted, is very material, because it contains a qualification of the general rule. It is admitted on all hands, with *Hawkins,* that for errors committed by a judge, *quatenus* a judge, he is not responsible, but it is equally contended, and *Hawkins* agrees in the doctrine, that if he acts extrajudically, he is then responsible. Indeed, *Hawkins* carries it beyond the jurisdiction, for he intimates that if a judge acts out of character, " he will be dealt with according to the same capacity, to which he so basely degrades himself." Our constitution renders a judge liable to impeachment for male and corrupt conduct in office. And the punishment does not extend further than to removal from office, and disqualification to hold any place of honour, trust or profit ; but the party so convicted is, nevertheless, liable and subject to indictment, trial, judgment and punishment according to the laws of the land. The male and corrupt conduct cannot be ascribed to any error of the understanding, or to any misconduct, however gross or oppressive, or however injurious to individuals, unless it is attended by bad and corrupt motives. The *malus animus* is difficult, at all times, to establish ; and there is no cause, be it ever so desperate, no conduct, be it ever so abandoned, but it may find not only advocates, but advocates who can advance plausible arguments, and who can gild over high-handed acts of oppression, with declamatory appeals in favour of judicial independence and official dignity. It will, therefore, be a rare instance to bring proof sufficiently clear against a judge, in order to produce

IN ERROR.
......
ALBANY,
April, 1811.

YATES
v.
LANSING.

his removal. Impeachment is not only difficult to institute and hard to establish, but, when effected, what good does it do to the injured party? Does the removal of an unjust judge remunerate him for imprisonment, for multiplied vexations and accumulated expenses. The protection furnished to a court, is commensurate with its jurisdiction; for where jurisdiction ends, the judge also ceases to be a judge, and is not entitled to the immunities and rights of one. This is the recorded opinion of the defendant, delivered in the incipient stages of this affair. " Upon my judicially determining (says the chancellor) that the interference of a single judge, to obstruct the process, and impede the justice of this court, was unwarranted, that his proceedings were *coram non judice*, it followed, as a necessary consequence, that his reiterating his interference, might or might not, according to circumstances, be imputed to him as a contempt of this court; for though a judge acting in the sphere of his jurisdiction, cannot, unless actuated by corrupt motives, be impeached or questioned, it is otherwise, where such jurisdiction does not exist; he is then exposed to be treated as a contemner of the court, with whose process he interferes." (See printed case, *Ex parte Yates*, p. 105.) Here we have the authority of the chancellor himself, that when a judge of one of the highest tribunals exceeds his jurisdiction, and trespasses upon that of a coördinate tribunal, he may be punished for a contempt; and if liable in that way, he must surely be responsible in a civil suit, to the party aggrieved; and here let me add, that it comes with a very ill grace from superior tribunals, to say that whether they act within or without their jurisdiction, they are equally protected from accountability, but inferior courts must take care and keep within their jurisdiction, for although their knowledge of the law is not so extensive as that of the other courts, yet their ignorance shall be no excuse, and although they require a more extensive, yet they shall receive a more limited protection. And let me further add, that this doctrine is not only unreasonable in itself, repugnant to law and common sense, but it is contrary to the principles of our government. The principle of responsibility pervades every department of a free government; for wherever responsibility ends tyranny begins. That a judge may fine and imprison, and punish *ad libitum;* and whether he acts according to law or not, he cannot be reached by suit or indictment, is, in fact, saying that he may act the tyrant at pleasure. No man in the community is safe, if the judges who advocate such monstrous doctrines are,

which I can never believe, prepared to exhibit their practical *IN ERROR.*
......
ALBANY,
April, 1811.

YATES
v.
LANSING.
operation, unless they are effectually checked and controlled by
this high tribunal. The institution of an impeachment, as I before
stated, is difficult. An accusation requires the sanction of two
thirds of the assembly, and a conviction that of two thirds of this
court, and the punishment neither furnishes any remedy to the
injured party, nor does it extend to any personal penalties. How
difficult must it be, then, to convict a tyrannical judge, especially
under the *ægis* of mental error, and under the *Telamonian* shield
of judicial irresponsibility? Our constitution contemplates an im-
peachment for *male and corrupt conduct in office,* for acts done as
a judge; and whether considering the extraordinary evasions that
have been practised, a party complained against, in a case like
the present, might not say in his defence, that the facts alleged
being extrajudicial, he is not liable as for official conduct, is a
point which time alone can determine. I can, therefore, never
subscribe to the doctrine of unaccountability in the higher courts.
The true distinction has been very judiciously pointed out in the
course of this discussion. An inferior court shall, when questioned,
show that it acted within its jurisdiction. Whereas in courts of
general jurisdiction, jurisdiction is presumed until the contrary is
shown. ° ° °

The only remaining question is, whether the chancellor acted
within his jurisdiction. If his interference was prohibited by the
statute, it clearly follows that his proceedings were *coram non
judice,* and that he is liable in the same way as any other individual.

It is contended, first, that the statutory inhibition does not
extend to courts; secondly, that if it does, yet that this case
falls within one of the exceptions.

As to the first point, the words of the act are, " That if any
person shall knowingly, contrary to this act, recommit or imprison,
or cause to be recommitted or imprisoned, for the same offence or
pretended offence, any person so set at large, or shall knowingly
aid or assist therein, he shall forfeit to the party aggrieved 1,250
dollars, any colourable pretence or variation in the warrant of
commitment notwithstanding."

To ascertain the meaning of this provision, and to identify the
persons obnoxious to the penalty, it is necessary to observe, that,
in the preceding section of the statute, there is an express inflic-
tion of the same penalty upon the chancellor and judges of the
supreme court, for denying to allow the writ of *habeas corpus;*

*IN ERROR.*
......
ALBANY,
April, 1811.

YATES
v.
LANSING.

and as the denial of the writ, in cases where it ought to be granted, is no greater injury to the individual than recommitting him for the same offence, where it has been granted and he has been set at large by competent authority, it is to be presumed that for similar injuries similar remedies would be provided, and that for similar offences, the same penalties would be prescribed. Indeed, the imposing a penalty on a judicial officer, for denying the writ of *habeas corpus,* is much more severe than the infliction of a penalty for knowingly recommitting a person set at large on a *habeas corpus.* It is sufficient, however, to show that the legislature intended to guard the liberty of the citizen, by holding these penalties over the heads of the ministers of justice. As the fourth section specifies the chancellor and judges of the supreme court, and the fifth refers to any person who shall knowingly recommit or imprison, it has been asked, why this phraseology was adopted, if it was intended to apply the penalty to the chancellor and judges in both cases? The answer is obvious. By the act, the chancellor and judges only have the power of granting a *habeas corpus;* but the persons having the power to imprison are as numerous as the magistrates and courts in the state. In the one case, there was no difficulty of specification; in the other, a general description was indispensable. But why should courts be protected more than other persons? Is it not their bounden duty to protect the liberties of the citizen? Is this not one of the great ends of their institution? And if they violate the duties which they owe to the state, if they defeat the object of their establishment, why should their judicial character protect them? The phraseology of the statute evidently refers to courts. *Recommitment* implies *commitment,* which is a judicial act: *Any colourable pretence or variation in the warrant of commitment notwithstanding,* certainly intends a judicial act, and was meant to guard against evasions of the provision by varying the apparent grounds of proceeding. Indeed, the principle contended for has not a shadow of support. If the chancellor is protected on the ground of his being a court, so is every justice of the peace, and every inferior tribunal, and thus the statute would be a perfect dead letter. Here, let me further remark, that wherever a judge usurps a jurisdiction, the act he does is not a judicial act, however it may appear, but the act of an individual, though on either hypothesis the penalty would reach him.

As to the second point, it is said by the *Chief Justice,* " the

statute allows the party so discharged to be again imprisoned for the same offence, provided it be by the legal order or process of the court wherein he is bound by recognisance to appear, or other court having jurisdiction of the cause. Any court which has jurisdiction of the subject matter may reimprison, notwithstanding the discharge."

The *British* statute directs a recognisance to be taken for the appearance of the prisoner in the B. R. or in such other court where the offence is properly cognisable. Our statute says generally, at the next court where the offence is properly cognisable, as the case should require. The right of reimprisonment, then, exists only in the court where he is recognised to appear, or in the court having jurisdiction of the cause; evidently meaning, that if he is bound to appear at one of our criminal courts, say the general sessions, and is tried and found guilty there, he may be reimprisoned, or if he is bound to appear at the general sessions, and is found guilty at a court of *oyer and terminer*, a court having jurisdiction of the cause, he may also be imprisoned. But here a latitudinal construction is adopted which will entirely nullify the statute. Any court having jurisdiction of the subject matter has jurisdiction of the cause, and may reimprison, says the *Chief Justice*. The chancellor has jurisdiction in contempts; the plaintiff was committed for a contempt; therefore, he had jurisdiction of the subject matter; and having jurisdiction of the subject matter, he had jurisdiction of the cause, and had a right to reimprison. Unfortunately, this conclusion is founded upon a gratuitous assumption of facts, and upon the most common place sophism. In the first place, it is denied that the plaintiff was committed for a contempt only. He was committed for a misdemeanor; 2d. On every concession, the commitment was for a misdemeanor and a contempt blended together, and so far as the misdemeanor entered into the cause of commitment, he had no jurisdiction; and, therefore, he had not complete jurisdiction of the cause, but acted under a usurped character; 3d. Having jurisdiction of the subject matter does not necessarily imply having jurisdiction of the cause. If a power to commit for crimes generally, which is a jurisdiction over the subject matter, involves a power to recommit in a case wherein a prisoner is discharged under the *habeas corpus* act, then this great charter of our liberties, this boasted palladium of personal security, is a mockery and imposture. In the cases of *Benedict Lewis* and *Hannah Clapp,*

*IN ERROR.*
......
ALBANY,
April, 1811.

YATES
v.
LANSING.

discharged by the *Chief Justice* under the *habeas corpus* act, the magistrates of the city of *Albany,* who had committed them to prison, had jurisdiction of the subject matter, by the " act for apprehending and punishing disorderly persons;" now, if having jurisdiction of the subject matter invested them with the right of reimprisonment, of what use or validity was the discharge of the *Chief Justice?* Of what benefit is the *habeas corpus* act against encroachments of a tyrannical judge? Will not the construction of the *Chief Justice* effectually protect him against the penalties of the statute, and leave personal liberty in the same state of insecurity as it was before the statute was passed? Having jurisdiction over the subject matter does not, therefore, give the judge jurisdiction of the cause. *The subject matter is the crime in the abstract. The cause is the case of the individual.* In the case of *Groenvelt* v. *Burnwell,* and other censors of the college of physicians, this distinction was well remarked by Lord Chief Justice *Holt.* " Here," said he, " the *subject matter* and *the person* are under the jurisdiction of the censors." The concurrence of both gave them jurisdiction of the cause, and protected them from amenability ; but'if the *person* had not been within their jurisdiction as well as the *subject matter,* then they would have been liable. After the discharge by the judge, the chancellor had no jurisdiction over the case of the plaintiff, even if he had it in the first instance, and, therefore, he had no power of reimprisonment. Jurisdiction of a cause intends the power of trying it; and will any construction invest the chancellor with this right in the present case ? It appears to me that nothing can be more clear. The whole superstructure of sophistry is built upon the sandy foundation of a *petitio principii,* and respecting, as I do, the talents and erudition of its author, I cannot but say, on this occasion, " *Neque semper arcum tendit Apollo.*"

It is with not a little regret that I have seen the commencement and the progress of this controversy. Considering it as a dispute between two individuals, it dwindles into insignificance ; but, in most of its stages, it has become a controversy between power and right, and between judicial tyranny and the liberty of the citizen. In this point of view, it has assumed an importance proportioned to the value of the objects which it embraces; and let not the unhallowed tongue of malignity insinuate, that the decision of this court, if against the judgment of the supreme court, will operate as a protection to malepractice, extortion and misdemeanors.

If the plaintiff is guilty, he is still liable to punishment; but

whether guilty, or innocent, he ought to be legally proceeded against. This is a right which the most abandoned criminal has equally with the best citizen. But what is the true state of the case? The plaintiff, in common with many other masters in chancery, had filed bills and carried on equity suits, in the name of another solicitor. Complaint was made against him by a client. The solicitor, although he had received a fee for permitting another solicitor to be substituted, declared it was all done without his consent. The party was excluded from the benefit of a purgation on oath, according to the general, and, I may say, invariable course of chancery; and he was committed to prison, without limitation of time. If his oath had been received in explanation, it would have been at least equal to the panic-struck testimony of the principal witness against him. A commitment for the first offence, under these circumstances, was, to say the least, a very harsh, a very unnecessary, and a very unprecedented measure; and in this case, it might be truly said, *jus summum sæpe summa est malitia.** But the proceeding being on the very face of it for a crime, and, consequently, illegal, he was discharged on a *habeas corpus.* Here, in all reason, and according to all law, the business ought to have been arrested. But Mr. *Yates* was recommitted, in defiance of this great bulwark against tyranny, and then the transaction assumed a new, interesting and extraordinary aspect. It was no longer the case of an injured individual. It became the case of every member in the community; and among the novel and extraordinary doctrines which this controversy has elicited, we are at length told, with judicial solemnity, that a judge of the supreme court, or the chancellor, acting as such, are beyond the reach of prosecution or indictment, whether they act with or without jurisdiction, and be their conduct ever so illegal or oppressive. To these doctrines I can never subscribe. And I consider the decision of this day as extending beyond the remuneration or punishment of individuals; that it will, in all its bearings and aspects, decide whether the ministers of justice may oppress with impunity! Whether the *habeas corpus* act shall any longer dispense its blessings, and whether the law shall bend to the judge, or the judge bend to the majesty of the law!

* Terence.

BLOODGOOD, GILBERT, SELDEN and SMALLY, Senators, were also of opinion that the judgment of the supreme court ought to be reversed.

YATES and TOWNSEND, Senators, gave no opinion.

IN ERROR.

......

ALBANY,
Jan. 1812.

A majority of the court being of opinion that the judgment of the supreme court ought to be affirmed, it was, thereupon,

ORDERED and ADJUDGED, that the judgment given in the supreme court be affirmed, and the record remitted, &c. and that the plaintiff in error pay to the defendant his double costs, to be taxed, &c.

Judgment affirmed.*

* April 6th,
1811. For af-
firming, 14.
For reversing,
5.