# N. Y. CITY COURT.

JOHN W. STEPHENSON agt. WILLIAM J. HANSON.

In the Matter of the Application of WILLIAM J. HANSON agt. JOHN KOLTER, a surety.

*Surety on an undertaking on which order of arrest was granted — Power of court to punish surety for false swearing as to his property — Code of Civil Procedure, section 2285.*

A surety on an undertaking on which an order of arrest was granted, whe swears falsely as to his pecuniary responsibility, is guilty of perjury, which is a contempt of court, and the court is empowered to punish that offense by imposing a fine sufficient to indemnify the defendant for the loss and injury he has sustained through the surety's misconduct, and by imprisoning him for six months, and until the fine is paid.

*Special Term, June, 1884.*

MOTION to punish the surety for contempt in swearing falsely as to his pecuniary responsibility.

Kolter was a surety upon an undertaking, on which an order of arrest was granted, in a certain action in which this applicant was the defendant and one Stephenson the plaintiff; the order of arrest therein was vacated. Judgment was subsequently recovered by Hanson against the surety Kolter; for

the sum of $281.65, damages and costs, sustained by reason of his arrest.

In that action the defendant was examined as to his property, upon the return of execution wholly unsatisfied, and upon the facts disclosed this motion is made.

HYATT, J. — It is conceded that on June 9, 1883, the surety Kolter signed an undertaking, in the usual form, as surety upon an order of arrest in the action of *Stephenson* agt. *Hanson*; Hanson alleges that he also justified, by swearing that he was worth $500 over and above all his debts and liabilities; the surety deposes, upon his examination as a judgment debtor in the action of *Hanson* agt. *Kolter*, that although he signed and executed the instrument " he did not go before any notary upon that bond, and did not swear to the affidavit therein; that he signed his name and went away without reading the document;" but even if this statement is true, he at the same time deposed that in the same action " he signed a second undertaking, marked filed July 20, 1883; that he signed the affidavit of justification therein, in the office of a lawyer and notary public, without reading or having it read to him, and supposes that he must have sworn to that affidavit before the notary public; that he has been watchman and housekeeper since May, 1884, and prior to that time was a repairer of billiard tables; that he is married and supports a family; that he is not and was not prior to June 6, 1884 (date of the order for his examination as a judgment debtor), worth anything or possessed of any property, real or personal, or of any nature whatsoever, except household furniture exempt from execution; that he has no money except five dollars in the bank, and has had no other money in the bank for over a year last past."

He further deposes positively: " I have been in no better position pecuniarily, during more than a year last past, except that I acquired in the spring of 1883 a contingent interest in two second-hand billiard tables, with another, paying sixty

dollars apiece, share and share alike, as part owner. In October, 1883, I was paid seventy-five dollars for my interest; we advertised them for sale and was not offered any price for them, but think we could sell them for about $175 apiece; I desire to state nothing to my foregoing testimony."

The examination was subscribed and sworn to, after having been read to him, by the same judgment debtor, June 9, 1884. Upon the 17th of June, 1884, his examination was continued. He then deposed as follows: " Upon my former examination I was not represented by counsel as I am now; I reside at 111 Fifth avenue, New York city; I am watchman and housekeeper at that place for August Belmont; I have been with him as watchman fourteen years; when I was examined before I thought that reference was only made to my property in this city when asked about my property; I own three lots. of ground in Cook county, Illinois, near Chicago; I got them from Thomas Back, to whom I loaned $100; I produce the deed he gave me; he has never paid any part of the loan; the date of the loan was February 23, 1878; he was to return it March 23, 1878; I have paid taxes ever since; it is free and clear of incumbrances; in the year 1878 those lots were worth $1,300, and they have increased in value since; I have seen Mr. Back since; he said he had no money; could not pay me, and was sorry, that I could keep the lots; that his wife was dead and he never could pay me; the billiard tables are worth $250 apiece; I did not read the undertakings when I signed them; they were not explained to me, and I did not know what they were; when I signed the undertakings I considered myself worth double the amount therein mentioned, and do so now."

Upon his cross-examination he testified: " I knew I was signing undertakings; naturally enough I knew when I signed them I must be worth some hundreds of dollars; I was born in New York city; went to primary school, also night school; I can read; I have taken no proceedings to perfect title under the deed; I don't know where the grantor is; have not seen

him for a year last past; I paid taxes all along; the yearly taxes are two dollars and some cents; never saw the lots; my idea of their value is derived from the consideration stated in Cummings' deed to Back; I don't know whether the lots are improved or not, nor how far they are from Chicago; I have heard that their value was more than $1,300."

After a careful examination of Kolter's testimony as thus fully set forth, I cannot reconcile its many inconsistencies of statement, and fail to find either excuse or justification for the positive contradiction of facts sworn to by the judgment-debtor upon his first examination.

Kolter is an intelligent man; has had some schooling; his occupation calls for the possession of judgment and the exercise of shrewdness; it would naturally surround him by associations tending to increase, rather than to diminish, those faculties, and certainly, in some degree, to impress him with a sense of responsibility for his acts, he knew what an undertaking was and the obligation it imposed; that on each occasion he had signed the undertaking, and upon one at least the affidavit of justification; he claims he did not swear to the first, but supposes he did to the second, before the notary present, yet, upon his direct-examination, June 17, 1884, he swore: "I did not read the undertakings when I signed them, and did not know what I was signing;" and then upon his cross-examination he swore "that it entered into his mind what he was worth at the time he signed, because he then knew he was signing undertakings, and that naturally enough he knew when he signed he must be worth hundreds of dollars.

On the first examination it appears that his occupation as night watchman and housekeeper commenced May, 1884, and that he had not owned any property within a year except a half interest in two second-hand billiard tables, for which he accepted seventy-five dollars, although he thought they could be sold for $175 apiece, notwithstanding they had been advertised and no offer received for them.

On his second examination he testified that his occupation,

as formerly sworn to, had existed for the past fourteen years, and that the said tables were worth $250 apiece.

The judgment debtor's explanation of his contradictory statements, made at the two examinations, is insufficient, and, under all the circumstances, incredible.   I cannot believe that on his first examination he was puzzled or thought that the examining counsel referred only to property in the city.   When asked as to his real and personal property, he positively stated that he was not worth anything or possessed of real or personal property of any nature whatsoever, except what he expressly claimed was exempt from execution (household furniture); that he had been in no better position (June 9, 1884) for more than a year last past, nor within that time owned or been possessed of any other property except the billiard tables.   It is probable that it occurred to the mind of the judgment debtor that on the 19th of July, 1883, he had executed an undertaking upon an order of arrest, and had sworn to the affidavit of justification annexed thereto, to the effect that he was worth $500 over and above all his debts and liabilities; whereupon, at the second examination, he admitted the ownership of the three lots of ground in Illinois, conveyed, together with a gold watch, by one Back and wife to secure a loan from him to them of $100, February 23, 1878, and that the loan had never been paid; that he had seen Back a year ago, who told him that he could not pay and that he could keep the lots; he then further testified that he had never seen the lots; that he knew little or nothing about them, and had heard that they were worth more than $1,300.

The most plausible inference that can be drawn from that statement is, that when the judgment debtor swore that he had no property, he believed the lots to be without any value; and in view of their abandonment, together with the gold watch, and of the entire absence of proof of any value, I shall consider their value at $100.

My judgment, therefore, based upon all the facts before

me, leads to the conclusion that when the surety executed the undertaking he was possessed of five dollars in the Bowery Savings Bank, an interest in two billiard tables of the value of seventy-five dollars, and three lots in Illinois of the value of $100, property amounting in all to $180, and that the affidavit of justification attached to the said undertaking, sworn to July 19, 1883, was false.

So long as the law of this state provides for arrest in civil proceedings, its requirements should be enforced with literal exactness. The defendant Hanson was entitled to two sufficient sureties, as provided in section 559, Code of Civil Procedure, and he would not have been arrested and held to bail if Kolter had not acted as surety and falsely sworn that he was worth the sum in which he justified.

It is no slight matter to deprive a person of his liberty and cause, or aid in causing, his imprisonment, without due process of law; yet this surety seems to have regarded his performance as a most trivial one, and frankly testifies, seemingly as an adequate apology, " that he went on the undertaking as a matter of friendship for Mr. Stephenson, and received not one dollar for it."

It is to be regretted that he is not alone in his flimsy view of the law, and that he has so large a following of others who regard the act of becoming a surety as simply perfunctory, and not one of the necessary safeguards against the possible, and too frequent, abuses and perversions of the provisional remedy of arrest in civil actions.

The surety was guilty of perjury, which is a contempt of court (*Stackhouse* agt. *French*, 1 *Bing.*, 365).

Section 2285, Code of Civil Procedure, empowers the court to punish that offense by imposing a fine sufficient to indemnify the defendant for the loss and injury he has sustained through the surety's misconduct, and by imprisoning him for six months and until the fine is paid. The power to punish for contempt is a branch of the common law, adopted and sanctioned by the constitution of this state (*Yates* agt. *Lans-*

*ing*, 9 *Johns.*, 416; *Eagan* agt. *Lynch*, 3 *Civil Pro. R.*, 236).

The language of the undertaking fixes the maturity of the surety's obligation upon the date of the order (May 6, 1884) *finally vacating the arrest.* The fact that the plaintiff has appealed from the judgment in the original action, is therefore not material.

It is urged that the surety did not willfully and knowingly mislead the court, and intentionally swear falsely; if so, I will extend to him the benefit of the doubt, and will not inflict the punishment of six months' imprisonment, as for a criminal contempt. The power and duty of the court is to redress the wrong of the injured party; it can make no difference to him whether the contempt was designedly or negligently committed, his loss is the same in either event.

The actual loss occasioned by the wrongful act of the surety Kolter is the amount of the judgment recovered against him by Hanson, in the action upon the undertaking, to wit, $281.65, with interest, and fifty dollars allowed as reasonable counsel fee for the legal services required in the proceedings.

The surety is fined that amount and his commitment is directed until the fine is paid.